Filed 7/11/14  In re C.P. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re C.P., a Person Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY, <br><br>      Plaintiff and Respondent, <br><br> v. <br><br> J.H., <br><br>      Defendant and Appellant. | A139591 & A140034 <br><br> (San Francisco City & County Super. Ct. No. JD11-3214) |

J.H. (mother) is the mother of three children who have been found to be dependent children of the juvenile court under Welfare and Institutions Code section 300.[1]  These consolidated appeals concern the youngest of mother's children, her son, C.P.  In case No. A139591, mother appeals the juvenile court's denial without a hearing of her petition for modification pursuant to section 388.  In case No. A140034, mother appeals the trial court's order following a section 366.26 hearing that terminated dependency jurisdiction and granted legal guardianship over C.P. to a nonrelative caregiver.  Having carefully considered the arguments advanced by mother, we now affirm.

---

[1] All statutory references are to the Welfare and Institutions Code.

FACTUAL AND PROCEDURAL BACKGROUND

In June 2011, mother was arrested following a traffic stop for being under the influence of methamphetamines and possession of a controlled substance. Her children were taken into protective custody and placed in the home of the maternal grandmother (MGM). In July 2011, San Francisco Human Services Agency (Agency) filed a section 300 petition in regard to C.P. (born January 2003), and his two older half siblings. At a jurisdictional/dispositional hearing held in January 2012, the juvenile court sustained allegations under section 300, subdivision (b) that the children are at risk of harm due to mother's inability to care for them because she has a substance abuse problem requiring treatment and assessment, and that she was recently convicted of willful child endangerment following her arrest in June 2011.

An Agency report filed prior to the January 2012 hearing states that mother had participated only sporadically in services to date. Mother resided in San Francisco and had been in regular contact with the social worker, but reported that health problems and legal proceedings, as well as domestic violence issues with her then boyfriend, had made it difficult for her to reliably engage in reunification services. Recommended reunification services included individual therapy, parenting, inpatient substance abuse treatment, and visitation. Mother had not started therapy or parenting and did not think she required residential drug treatment. Mother had supervised weekly visitation with the children at the OMI Family Resource Center until late November 2011, when visitation was cancelled after mother failed to maintain contact and confirm visits. Also, mother was on probation in three separate counties, and had recently been convicted of child endangerment and sentenced to four years' probation with a condition that she complete a 52-week child abuse prevention class.

Regarding the children's placement, the Agency noted the siblings were appropriately placed with MGM. However, MGM advised the agency that while she could provide a permanent home for C.P.'s half siblings, she could not commit to caring for C.P. in the long term on account of his younger age and developmental needs. Accordingly, the Agency was seeking an alternative placement for C.P.

Mother's participation in the case plan had improved by July 2012. The Agency's status review report states mother entered Walden House residential treatment program on April 6, 2012, and continued to reside there. Mother was participating in therapeutic visitation at A Better Way and supervised visits at the Bayview Family Resource Center (Bayview). The report noted during visits mother actively played with the children and had the ability to be patient with and help soothe C.P. when he was tired or not feeling well. Mother received guidance from A Better Way in helping C.P. to focus, manage his moods and appropriately address his feelings.

Mother began individual therapy in May 2012. Treatment goals for mother consisted of taking responsibility for how substance abuse had affected her life and her children's lives, and avoiding destructive relationships. Mother's therapist reports mother is motivated to come to therapy, but is in denial about past destructive relationships and minimizes the impact drug abuse has had on her life. Mother's case manager at Walden House believed mother needed to continue with residential treatment in order to build her self-esteem and acquire the coping skills to deal with grief and guilt without resorting to drugs.

The Agency's July 2012 status review also reported C.P. completed second grade. C.P. was found eligible for special education services under emotional disturbance following an individual education plan meeting in March 2012. According to C.P.'s therapist, C.P. struggled to make friends with children his age; he was socially immature and emotionally stunted, and functioned at the emotional level of a six-year-old. After his school reported comments of suicidal ideation, C.P.'s therapist requested a psychological evaluation for him. His therapist reported C.P. had "intense anger" and saw himself as a "bad kid." Also, the Agency reported that C.P. moved from MGM's home to a new placement with a paternal family friend where he was the only child in the home.

Regarding visitation, the Agency reported mother was allotted two hours of weekly supervised visitation with all three children through Bayview and an additional two hours per week of supervised visitation with C.P. through A Better Way. Visitation

3

was suspended for two months while mother was incarcerated. Following resumption of visitation, reports from Bayview showed mother missed four out of seven visits scheduled between March 31 and May 19, 2012. Visitation reports from A Better Way showed mother arrived on time and completed all visits scheduled between February 8 and May 19, 2012. The Agency stated it intended to move all visits to A Better Way in order for visitation to be as successful as possible. The Agency recommended that services continue for an additional six months, and that mother should remain at Walden House for the full six months "in order . . . to internalize the tools and obtain the necessary support to remain and sustain a clean and sober life."

The Agency filed its 12-month status review on August 23, 2012. The Agency reported mother continued to reside at Walden House, which provides her "with her basic needs and the structure required for her recovery." Mother also continued to participate in supervised visits with C.P. through A Better Way. These visits were supervised and mother's attendance was regular.

Regarding the children, the Agency reported that C.P.'s teenage half siblings stated they did not wish to reunify with mother due to the disruption and uncertainty they experienced in her care. Rather, they wished to remain in the care of MGM. C.P. was handling the transition to his new placement well and appeared to be developing a positive relationship with his caregiver. However, the social worker was concerned C.P. exhibited psychological and emotional problems requiring continued support and monitoring. She stated C.P. has difficulty coping with his emotions, and used an imaginary reality or characters to avoid dealing with hurt and pain.

The social worker's concerns were borne out in a psychological evaluation of C.P. by Dr. Jennifer Eggert filed under seal in October 2012. Dr. Eggert noted C.P.'s father died two years ago following his relapse into chronic substance abuse after he was released from prison. Dr. Eggert observed C.P. struggled with self-injurious behavior in response to perceived failure, often becoming tearful and hitting himself if he did not complete a task to perfection. Also, C.P. demonstrated a very low tolerance for frustration. Dr. Eggert diagnosed C.P. with chronic posttraumatic stress disorder and

4

"Major Depressive Disorder, Severe with Psychotic Features" due to exposure to domestic violence and childhood neglect. However, Dr. Eggert opined the prognosis was good with support and intervention, and that C.P. "will likely show improvement when his environment and attachment figures are more stable." Among other things, Dr. Eggert recommended that C.P. be evaluated for psychotropic medication.

As of October 5, 2012, when the Agency filed an addendum report, mother had left Walden house and was living on her own in San Francisco. The report noted mother had completed certain aspects of her case plan, including parenting education, residential drug treatment and refraining from drug use. However, mother's therapist was concerned mother did not have an after care plan and was "setting herself up for relapse." A Walden House worker stated mother initially agreed to continue with Walden's after care program then opted against it. Mother is exploring other options, but is currently not in an outpatient treatment program. Mother has agreed to drug testing.

In the addendum report, the Agency outlined the findings in Dr. Egger's psychological assessment and stated C.P. was continuing in weekly therapy to address such issues as building peer relationships, feelings of grief over the loss of his father, his relationship with his caregiver, and his loyalty to his mother. The Agency opined that his "significant mental health issues" required stability and consistency and he remained at "high risk" due to "mother's non involvement in an after care program, as well as her non follow-through in taking psychotropic medication as recommended by her clinician." The Agency did not report on the nature or frequency on mother's visitation with C.P., but recommended that it "remain therapeutic."

In its status report prepared in connection with the 18-month/permanency review set for January 17, 2013, the Agency reported mother was currently residing in an apartment in San Francisco, struggling to secure steady employment and making ends meet through temporary catering work and odd jobs. Mother was participating in weekly therapeutic visits with C.P. through A Better Way and had recently started attending weekly collateral sessions with C.P.'s therapist. Reports from these sessions indicated mother was making positive progress in parenting skills, including an increased ability to

5

engage with C.P. about how her substance abuse had impacted him and his grief over the death of his father. In December 2012, mother agreed to provide four consecutive clean drug tests in order to progress to unsupervised visitation with C.P.; mother had provided three clean tests and the social worker was awaiting the results on the fourth test when the report was written.

Mother's therapist reported she meets with mother weekly and mother's attendance is regular. Mother was utilizing learned coping skills to manage her emotions without resorting to drugs or destructive relationships. Mother's therapist referred her for a medical evaluation for psychotropic medication and mother was prescribed an antidepressant in low dosage. Mother had been clean and sober for about eight months and was attending the Asian American Recovery Center's (AARC) outpatient treatment program. Staff there reported they prefer clients to attend three times per week and mother was "attending groups intermittently on average twice a week."

The 18-month status report also noted C.P. had been in his current placement for six months. It took C.P. some time to adjust, but he was more comfortable with the caregiver. C.P.'s therapist reports he had "made progress in this placement," is happy there, and had "developed positive social relationships."

In assessment and evaluation at 18 months, the Agency stated C.P. and mother had both made "significant progress psychologically and emotionally" in the prior six months. Mother had attained eight months of sobriety, was receptive to services and had shown a willingness to learn how to parent a special needs child. C.P. had shown a decrease in self-injurious behaviors, as well as an ability to make friendships. Due to C.P.'s "psychological vulnerabilities," the Agency opined that any disruption in C.P.'s current placement could "destabilize the social/emotional progress he has made." The Agency further opined it is important that mother "develop a healthy support system and stabilize her own basic needs before being able to meet her son's needs." Accordingly, the Agency recommended the court terminate reunification services at 18 months and develop a more permanent plan for C.P.

On January 17, 2013, the 18-month review hearing was continued to January 31, when it was again continued to April 18. On or about February 15, however, the Agency filed an application for an order shortening time on a section 388 petition because mother had recently relapsed and the social worker received information mother attempted to falsify or cheat on a drug test. The Agency stated mother currently had some unsupervised visitation with C.P. Based on mother's relapse, the Agency opined C.P. was at risk with mother in an unsupervised setting and asked the court to order supervised visitation only. The section 388 petition asserted that since the court granted the Agency discretion to provide unsupervised visitation upon four clean drug tests by order of December 10, 2012, mother had made "very few, if any, regularly scheduled phone calls to [C.P.], despite changing the time per Mother's request," and she "failed to meet with [C.P.]'s therapist for the majority of the weeks since the order." Also, mother "attempted to substitute a container full of urine for her sample and when this was noticed by testing staff, mother attempted to bribe the facility into not reporting the problem, but admits relapse." The court ruled on the Agency's section 388 petition on March 12, 2013, terminating the December 2012 visitation order and instead ordering supervised weekly therapeutic visits between mother and C.P.

Meanwhile, on February 22, 2013, C.P. underwent a clinical evaluation for psychotropic medication. The prescribing physician, Dr. Hollingsworth, reviewed Dr. Egger's psychological evaluation, noting, "[C.P.] has a history of severe angry outbursts, severe emotional lability, suicidal thinking . . . [and] severe mood disorders." Dr. Hollingsworth proposed a daily dose of 20 milligrams of Abilify, targeting C.P.'s severe mood lability; after C.P. adjusted to Abilify, Dr. Hollingsworth proposed adding incremental doses of Zoloft, targeting C.P.'s depressive symptoms and anxiety.

The Agency filed an addendum report on April 15 in connection with the 18-month review hearing scheduled on April 18, 2013. The Agency reported that mother's housing situation had recently been unstable. In February, mother told the social worker she had been living in a motel for the past two months after she "got behind on her rent" and had to move out of her apartment. Regarding mother's relapse, the addendum report

7

stated mother was caught trying to cheat on a drug test on February 14, 2013, and subsequently tested positive for cocaine on February 21 and positive for amphetamines, methamphetamines and cocaine on February 25. After three weeks of positive drug tests, mother's tests showed negative for substances, although mother failed to test on March 25. Mother's counselor at the AARC outpatient treatment center reported on March 12 that mother's attendance had been fairly regular except for the last two weeks. Mother's therapist reported whereas mother's participation in treatment remains regular she had become "progressively depressed since her court hearing" regarding C.P.'s half siblings. Mother's therapist recommended mother enter an inpatient treatment program on the basis mother "is not finished with substance abuse treatment and needs additional assistance with eliminating unhealthy dynamics."

In assessment and evaluation, the social worker stated, "mother has not mitigated the reasons for the Agency's involvement. Despite a period of regular to consistent participation in services and treatment, mother has not made [a] substantial change in preparing a stable home for C.P. [who] . . . continues to be psychologically vulnerable and needs a highly structured and consistent environment. The mother continues to struggle with her addiction and her housing situation which has not only been chaotic but remains unstable." The social worker opined mother's circumstances indicate that in order to ensure C.P.'s safety and well-being the court should terminate reunification services and proceed to a permanent plan, noting: "[C.P.]'s behaviors demonstrate a need for a highly structured, consistent home and he is currently in a placement that has demonstrated the ability to meet [his] needs."

Mother appeared with counsel at the 18-month review hearing on April 22, 2013. At the outset, mother's counsel stated she had consulted with her client and mother "is prepared to regretfully submit on termination of her reunification services" based on her recent relapse in February, and the fact she "is still attempting to get into another in-patient program." Counsel added that since the beginning of March all mother's drug tests have been clean.

The court found return of the minor to mother's care at 18 months posed a substantial risk to the minor's physical and emotional well-being as the "conditions still exist" that initially justified assumption of dependency jurisdiction. The court noted mother did not have stable housing and she suffered a relapse in February, indicating "[s]he does need to address her own problems with respect to substance abuse and dealing with stressors of life." Although mother had made "moderate" progress in mitigating the causes of the dependency, she was "not currently at a place where she can have the child back with her." Consequently, the court terminated reunification services and set a permanency planning hearing under section 366.26 for August 19, 2013. In regard to visitation, the court noted C.P. was "just starting Abilify" and it "looks like it's helping him, but things are still up in the air. And he does feel things very strongly. So I think that we need to go slow." The court ordered that the current arrangement of one therapeutic visit per week between mother and C.P. be continued pending a progress report on May 24.

According to the Agency's May 24 progress report, Seneca Connection Wrap Around had started working with C.P. and the caregiver in order to provide assistance with some of C.P.'s behavioral challenges at home and in school. C.P. also would continue to receive weekly therapy and meet once a week with his court appointed special advocate (CASA). C.P.'s therapist stated he is doing much better in school, his focus had improved and he was completing his school work. The Abilify medication seemed to be helping, as C.P. was receiving positive reports from school.

Also, the progress report stated a service providers meeting was held on May 13, 2013, and it was agreed it would be "clinically appropriate for [mother-minor] visits to remain therapeutic once a week." The team believed a two-hour format is appropriate to "sustain the structure that [C.P.] and his mother have been benefitting from, and to assist them in processing this period between post family reunification and permanency planning." Also, the treating therapists stressed it is important to implement ongoing "mediated discussions" between caregiver and mother in order to improve their

9

relationship and dialogue and reduce the stress on C.P. caused by his feelings of internal conflict/split loyalty between mother and caregiver.

The Agency social worker took up the issue of therapeutic visitation again in the section 366.26 report filed on July 30, 2013, stating that the once-a-week therapeutic contact between C.P. and mother is supervised by Michael Cheng through A Better Way. C.P. also had monitored, twice-a-week telephone contact with mother for 30 minutes on Thursdays and Sundays. Cheng observed C.P. and mother enjoy each other's company, had a great time together, and during therapeutic visits mother was attuned to C.P.'s emotions and needs. C.P.'s therapist reported he had a "positive relationship with his mother and she is an important figure in his life." The social worker opined the complexity of C.P.'s trauma had made it difficult to transition out of therapeutic contact, but it would be necessary to do so if legal guardianship for C.P. was adopted as the permanent plan.

The section 366.26 report also states C.P. has been under the care of the proposed legal guardian (PLG) for 13 months. During that time, C.P. "has tested the [PLG's] limits and has been torn by his loyalty to his mom. But [C.P.] has grown to trust and feel safe in the [PLG's] home." Also, the PLG had maintained maternal and paternal sibling contact for C.P., and at the same time had integrated him into her own family. Overall, the PLG was committed to providing C.P. with a sense of structure and stability that assisted him in making progress socially, emotionally, and academically. The Agency recommended legal guardianship as the most appropriate permanent plan.

On August 8, 2013, mother filed a request to change court order (Judicial Council Forms, form JV-180) pursuant to section 388, asking the court to change its April 2013 order terminating reunification services. The petition stated that on July 18, 2013, mother entered a residential substance abuse treatment program, "Casa Adelita," through the Latino Commission Agency. Also mother had maintained consistent weekly contact with C.P. until she entered the Casa Adelita program; however, upon entry, the program mandates a 30-day "black out" period during which mother cannot engage in visitation or telephone contact with C.P. Citing these changed circumstances, as well as the strong

10

bond and consistent visitation between mother and C.P., mother asserted it would be in C.P.'s best interests to grant six additional months of family reunification services to mother and order visitation at mother's treatment facility during the 10-week period mother was not allowed to travel outside the facility by herself. On August 13, 2013, the court filed Judicial Council form JV-183 (court order on Judicial Council form JV-180, request to change court order; JV-183 order), stating: "The court orders a hearing on the form JV-180 request because the best interest of the child may be promoted by the request. The hearing will take place on August 19, 2013."

At the outset of the combined section 388/section 366.26 hearing on August 19, C.P.'s counsel requested argument on the issue of whether mother's section 388 petition raised a prima facie case for relief. The court replied, "We can have some argument on that issue at this time." Mother's counsel, however, asserted, "The court has already made a finding of a prima facie case when it set this hearing. Otherwise, it would have been denied under number 2 of the JV-183. So I believe that initial finding has already been made by the court." On behalf of the Agency, the deputy city attorney argued "there [had] been no prima facie showing at all" because mother failed to demonstrate changed circumstances or that the requested order would be in C.P.'s best interests. After entertaining further argument of counsel, the court denied a hearing on the request for six more months of services, stating, "I am denying that. Because I do not find that based on the information that I have heard at this hearing that . . . a prima facie case for [a full evidentiary hearing] has been demonstrated." Mother's counsel requested a contested section 366.26 hearing, and the court set it for September 9, 2013. Mother filed an appeal of the court's denial of her section 388 petition on August 19, 2013.

The section 366.26 hearing was held on September 12, 2013. Counsel for the Agency informed the court that the parties had "reached a resolution," and counsel for the minor and for mother would "put parts of that on the record." Mother's counsel stated she had filed an appeal of the court's denial of mother's section 388 motion, and on that basis objected to the recommendation for guardianship; however, counsel stated she would not be presenting "any further evidence other than what is contained in the social

11

worker's report." Counsel for the Agency and the minor submitted on the issue of guardianship based on the section 366.26 report. The court stated it had read and considered the section 366.26 report, considered the wishes of the child consistent with his age, and taken judicial notice of all prior findings and orders in the proceeding. The court found removal of the minor from the caregiver would be detrimental to the emotional well-being of the child and established guardianship as the permanent plan. Minor's counsel then recited the visitation conditions agreed upon by the parties. Mother was granted one supervised visit per month of a minimum of two hours. Regarding telephone contact, C.P. could call mother twice a week as he wished and could choose the duration of the calls. Also, mother was allowed call C.P. once a month at a set day and time to be determined and could write to C.P. through minor's therapist. Visitation entailed certain conditions: Mother could not be under the influence of drugs or alcohol; mother would abide by the Agency's visitation policy and rule; mother would not initiate discussions regarding future plans with C.P. on such matters as reunification and visitation, and would respond as directed by minor's therapist if C.P. raises these matters; and mother would discuss all proposed gifts with the guardian before giving or presenting them to C.P. Thereafter, the court terminated the dependency and retained jurisdiction over the guardianship. Mother filed a timely notice of appeal of the court's guardianship orders on October 17, 2013, and we consolidated the appeals for purposes of briefing and decision.

## DISCUSSION

### A. *Section 388 Petition*

Mother asserts the court's denial of her section 388 petition was erroneous on several grounds. First, mother contends the court erred in denying her section 388 petition without holding an evidentiary hearing because she met the prima facie burden justifying a hearing on the petition. We disagree.

Whereas, a section 388 petition must be liberally construed in favor of its prima facie sufficiency (Cal. Rules of Court, rule 5.570(a); *In re Marilyn H.* (1993) 5 Cal.4th 295, 309), conclusory allegations in a petition or its supporting declarations, without

supporting evidence, are insufficient to make the required prima facie showing. (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250–251.) Rather, the prima facie showing refers to those facts that will sustain a favorable decision if the evidence submitted in support of the petition's allegations is credited. (See *In re Aaron R.* (2005) 130 Cal.App.4th 697, 705.) To make a prima facie showing, parents must allege facts showing: "(1) a genuine change of circumstances or new evidence, and that (2) revoking the previous order would be in the best interests of the children. [Citation.] If the liberally construed allegations of the petition do not show changed circumstances such that the child's best interests will be promoted by the proposed change of order, the dependency court need not order a hearing." (*In re Anthony W., supra,* at p. 250.) Furthermore, where, as here, a section 388 petition is filed *after* reunification services have been terminated, in assessing whether the 388 petition has made the required prima facie showing, the court must be mindful that "a parent's interest in the care, custody and companionship of the child are no longer paramount. [Citation.] Rather, at this point the focus shifts to the needs of the child for permanency and stability." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 464; see also *In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)

Under these standards, mother's section 388 petition patently failed to state a prima facie case. Mother's reunification services were terminated in April 2013 because she had not come to grips with her drug addiction and had recently relapsed into drug use following her graduation from a residential treatment program. With respect to these particular issues, the averments of mother's petition and supporting documentation showed only that she was continuing to grapple with her substance abuse problem. Whereas, it is to mother's credit that after termination of services she entered another residential drug treatment program, she was only in the initial stage of the program when she submitted her section 388 petition. The letter from the counselor at the Casa Adelita residential program that mother submitted with the section 388 petition verified mother entered the program on July 18, 2013, explained there was an initial 30-day blackout period, followed by telephone privileges after six weeks and six-hour passes from the facility after 10 weeks. The letter also stated the program lasted from six months to one

year, and involved self-help groups such as Narcotics Anonymous, as well as counseling and training programs in many subjects, such as parenting classes and life management. Accordingly, the fact mother was less than a month into a second residential drug treatment program does not constitute evidence of "a genuine change of circumstances" (*In re Anthony W., supra,* 87 Cal.App.4th at p. 250), especially since this development occurred subsequent to termination of services at 18 months and after mother suffered a relapse upon completing a prior residential drug rehabilitation program. Furthermore, all the other documentation mother provided in support of her section 388 motion related to programs she completed and services she received *prior to* her relapse in February and termination of services in April 2013. We fail to see how they constitute evidence of changed circumstances.[2] Moreover, in the section 388 petition, mother offered no evidence to support a finding that her request for six months of additional services would be in the minor's best interests; rather, mother merely offered conclusory assertions on that point based on the fact that she had reentered residential drug treatment and had engaged positively in services prior to her relapse.

In sum, mother's petition, liberally construed, at best showed that she had resumed efforts to address her substance abuse problems by entering another residential drug treatment program, and was in the early stages of that program. But a prima facie showing of change of circumstances must be of a significant nature that justifies the

_____

[2] Mother also stated in her petition that she had consistently and regularly visited the minor on a weekly basis until the visits were interrupted by the "blackout period" imposed under the Casa Adelita residential treatment program, and that the court should order resumption of such visits on account of the "strong bond" between she and the minor. These averments are not relevant to whether the petition showed a "genuine change of circumstances." Indeed, the dependency court was well aware of the ties between mother and minor when it terminated services at the 18-month review hearing; in fact, as noted above, it was because of the minor's bond to mother, coupled with the minor's fragile emotional and psychological condition, that the court ordered weekly "therapeutic visits" between mother and minor to continue in order to minimize any trauma associated with the minor's ongoing transition into the care of the PLG. Also, as noted above, the parties agreed therapeutic visitation should continue even after guardianship was established at the section 366.26 hearing.

14

requested modification. (*Ansley v. Superior Court* (1986) 185 Cal.App.3d 477, 485.) A prima facie showing of *changing*, as opposed to *changed*, circumstances is not enough. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47 ["A [§ 388] petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point, does not promote stability for the child or the child's best interests."]; see *In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 610 ["mere prima facie showing of changing . . . circumstances" insufficient for hearing on § 388 petition].) Accordingly, because mother failed to make a prima facie showing for a hearing on the section 388 petition, the trial court did not err by denying mother's section 388 petition without holding an evidentiary hearing.

Mother further contends the trial court erred by denying her section 388 petition without a full evidentiary hearing because the court's JV-183 order set a hearing on the petition, indicating the court had already determined she had stated a prima facie case. Alternatively, mother contends the court "held arguments on the section 388 petition that failed to rise to the level of an evidentiary hearing and so failed to comport with due process."

However, even if the court's JV-183 order setting a hearing is construed as a ruling that mother had shown a prima facie case, the court changed that ruling at the outset of the combined 388/366.26 hearing when it agreed to hear argument on whether the section 388 petition stated a prima facie case. In this regard, a trial court has "inherent power to reconsider and correct its own interim rulings" any time prior to entry of judgment, and that power is derived from the California Constitution. (*Kerns v. CSE Ins. Group* (2003) 106 Cal.App.4th 368, 385.) Thus, the dependency court was entitled to entertain oral argument on the question of whether mother stated a prima facie case, even after the JV-183 order set a hearing.[3]

_____

[3] Mother's reliance on *In re Lesly G.* (2008) 162 Cal.App.4th 904, is misplaced. In *Lesly G.*, the appellate court concluded that where mother made a prima facie case, the dependency court denied her due process when it ordered a hearing on her section 388

15

In any event, the right to a *hearing* does not necessarily entitle the petitioning party to a full *evidentiary* hearing. It is well recognized that due process "is a flexible concept which depends upon the circumstances and a balancing of various factors," and, more specifically, that "the due process right to present evidence is limited to relevant evidence of significant probative value to the issue before the court." (*In re Jeanette V.* (1998) 68 Cal.App.4th 811, 817; see *Sheri T. v. Superior Court* (2008) 166 Cal.App.4th 334, 341.) Even where due process rights are triggered, it must be determined "what process is due." (*In re Malinda S.* (1990) 51 Cal.3d 368, 383, partially superseded by statute on another ground as recognized in *In re Cindy L.* (1997) 17 Cal.4th 15, 22, fn. 3.; *In re Lesly G., supra,* 162 Cal.App.4th at p. 914.)[4]

Regarding due process attendant to section 388 petitions, the statute provides that if it appears that the best interests of the child may be promoted by the proposed change of order, the court shall order that a hearing be held. (§ 388, subd. (d).) Additionally, rule 5.570(h)(2) of the California Rules of Court requires that section 388 hearings be conducted in the same manner as a dispositional hearing if (a) the request is for termination of court-ordered reunification services or (b) there is a due process right to confront and cross-examine witnesses. Otherwise, proof may be by declaration and other documentary evidence, or by testimony, or both, at the discretion of the court. (See *In re Lesly G., supra,*162 Cal.App.4th at p. 913.) Thus, neither the statute nor the court rule mandates an evidentiary hearing, and due process does not necessarily compel the court to conduct an evidentiary hearing in every case. Moreover, at the court hearing on the section 388 petition, mother did not make an offer of proof or otherwise specify what

petition and then summarily denied the petition at the outset of the hearing. (*Id.* at pp. 913–915.) Here, not only have we concluded mother's petition patently failed to state a prima facie case, but the dependency court in this case did not deny mother a hearing on the petition; rather, the court limited the hearing to argument on the question of whether mother had stated a prima facie case (see *infra*).

[4] For example, in dependency proceedings, due process is not synonymous with full-fledged cross-examination rights. (*In re Jeanette V., supra,* 68 Cal.App.4th at p. 817; *Maricela C. v. Superior Court* (1998) 66 Cal.App.4th 1138, 1146.)

additional evidence, if any, she wanted to present. Under the circumstances presented here, we cannot say the court violated mother's due process rights by deciding her section 388 petition on the basis of information provided in the petition, the factual and procedural record in the case, and argument of counsel.[5] (See *In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1080–1081 (C.J.W.); see also *In re Justice P.* (2004) 123 Cal.App.4th 181, 189 [court may consider the entire factual and procedural history of the case in determining whether section 388 petition makes the necessary showing]; see also *In re Angel B., supra,* 97 Cal.App.4th at pp. 460–461 [if the petition fails to make the required prima facie showing, summary denial of the petition without a hearing does not violate the petitioner's due process rights].)

Furthermore, mother makes no serious argument that she would have prevailed had a full evidentiary hearing been held. Indeed, neither minor's counsel nor counsel for the Agency disputed that mother had entered a residential drug treatment program, so no testimony was necessary on that point. And, as noted above, the petition contained only conclusory averments, but no hard evidence that the mother's request for additional services would be in the best interests of the minor. Thus, a full hearing would have served no purpose. Accordingly, like the *C.J.W.* court, we conclude "[i]t is not reasonably likely additional testimony would have persuaded the court to grant the section 388 petition[ ] and offer reunification services to [mother]." (*C.J.W., supra,* 157 Cal.App.4th at p. 1081.)

---

[5] We specifically reject mother's assertion that due process required an evidentiary hearing because a "material conflict" in the evidence arose in the course of oral argument on mother's prima facie case. Mother's assertion is based on the fact that during oral argument minor's counsel commented, based on her conversations with minor's therapist, "how well [minor] has been doing with fewer visits." However, given the paucity of mother's showing of *changed* circumstances "such that the child's best interests will be promoted" by mother's request for an additional six months of services (*In re Anthony W., supra,* 87 Cal.App.4th at p. 250), an evidentiary hearing was not required on any issue raised by counsel's comment.

17

**B.** *The Court's Section 366.26 Order*

Mother contends the lack of a fair hearing on the section 388 petition means that we must reverse the orders terminating jurisdiction and granting guardianship. This contention necessarily fails because we have concluded mother was not denied due process and the dependency court did not err in denying her section 388 petition.

Mother further contends the dependency court abused its discretion by terminating dependency jurisdiction after selecting legal guardianship as the minor's permanent plan. Mother asserts continuing dependency jurisdiction is in the best interests of the child because it would permit the court to oversee visitation and ensure the guardian complies with the court's visitation order through periodic review. However, because mother did not object to termination of dependency on this ground at the section 366.26 hearing, the argument is waived. (See *In re Dakota S.* (2000) 85 Cal.App.4th 494, 501 [" ' "appellate court will ordinarily not consider procedural defects or erroneous rulings . . . where an objection could have been but was not" presented to the [trial] court" ' "].)

In any case, mother's argument fails on the merits. Mother relies on *In re K.D.* (2004) 124 Cal.App.4th 1013. There, the appellate court reversed the order terminating dependency jurisdiction and directed the trial court to hold periodic review hearings to ensure ongoing visitation is occurring. (*Id.* at p. 1020.) The appellate court found the trial court abused its discretion by terminating dependency jurisdiction because the appointed guardian was moving out of state and at the hearing on the guardianship his counsel suggested letters, telephone calls and video messages would provide sufficient visitation between mother and minor, and no face-to-face contact was necessary; the trial court disagreed and ordered face-to-face visitation occur at least twice a year. (*Id.* at p. 1019.) Under the circumstances in *K.D.*, the appellate court concluded the dependency court should have retained jurisdiction to ensure face-to-face visitation as ordered. (*Ibid*.) In this case, however, the guardian does not plan to leave the state and has expressed no reservations regarding continuing visitation; indeed, at the section 366.26 hearing, counsel for the agency stated the parties had "reached a resolution," and counsel for minor and mother "will put parts of that on the record" indicating the parties had *agreed*

18

on visitation.  Accordingly, because the parties were in agreement on the issue of visitation, the court did not abuse its discretion in terminating dependency jurisdiction. (Cf. *In re Twighla T.* (1992) 4 Cal.App.4th 799, 806 [trial court was "within its discretion in rejecting [mother]'s contention that continuing dependency jurisdiction was needed to assure [her] visitation rights" where "substantial evidence strongly supported the conclusion that visitation was not likely to be a serious problem in light of the guardian's cooperative attitude toward visitation.  If a problem nevertheless were to develop in the future, appellant would have access to the court through the court's jurisdiction over the guardianship itself."].)

## DISPOSITION

The dependency court's orders are affirmed.


_____
Becton, J.*


We concur:


_____
Margulies, Acting P.J.

_____
Dondero, J.


* Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

19