[No. G040245. Fourth Dist., Div. Three. July 22, 2008.]

SHERI T., Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
ORANGE COUNTY SOCIAL SERVICES AGENCY et al., Real Parties in
Interest.

## COUNSEL

Deborah A. Kwast, Public Defender, Frank Ospino, Assistant Public Defender, Robert Mueller and Paul DeQuattro, Deputy Public Defenders, for Petitioner.

Benjamin P. de Mayo, County Counsel, Karen L. Christensen and Jeannie Su, Deputy County Counsel, for Real Party in Interest Orange County Social Services Agency.

Law Office of Harold LaFlamme and Tina Stevens for Minor.

## OPINION

**SILLS, P. J.**—Taylor Y. was made a dependent of the juvenile court. Her mother, Sheri T., failed to reunify with her, and the juvenile court selected long-term foster care as her permanent plan. At a subsequent six-month status review hearing, the Orange County Social Services Agency recommended a new permanent plan selection hearing to consider adoption as Taylor's permanent plan. The mother objected and requested a hearing so she could show a new permanent plan selection hearing was not in Taylor's best interests. The juvenile court denied a hearing on Taylor's best interests and set a new permanent plan selection hearing. The mother seeks extraordinary relief from these orders. We deny relief.

### FACTS

Three-year-old Taylor Y. was detained by the Orange County Social Services Agency (SSA) in October 2004 when her parents, Sheri T. and Sheldon Y., were arrested and incarcerated, leaving her with no caretaker. A dependency petition was sustained, alleging the parents had unresolved histories of substance abuse and had never completed a drug treatment program. The juvenile court removed Taylor from parental custody and placed her with her maternal grandmother and stepgrandfather, Deanna and Donald M., who lived in Desert Hot Springs in Riverside County.

The mother relocated to Riverside County to be closer to Taylor, and the dependency case was transferred there in May 2005. The six-month review hearing was held in Riverside County in July 2005. The mother had been visiting Taylor twice a week and was "very affectionate, loving and concerned with her daughter during the visits." However, the mother had not been able to participate in her case plan. "The obstacles she generally has are that the programs are geographically too far, too expensive, or the time frames interfere with her work schedule." The SSA social worker, who prepared the report for the Riverside Juvenile Court, recommended six more months of reunification services, but the Riverside Juvenile Court returned Taylor to her mother under a plan of family maintenance. The mother left Taylor with the grandparents until September 2005, until she could "execute a plan to provide for the child's needs."

In December 2005, the Riverside social worker reported that the mother had returned to Orange County and had still not participated in her case plan. "[The mother] has had her child returned without completing any services, and only drug tested when advised failure to comply would result in immediate removal of the child. She does not appear to perceive the court-ordered services as a necessary set of tasks." Furthermore, the mother had allowed unauthorized contact between Taylor and the father, who was "again incarcerated for breaching [his parole terms]." The social worker felt the mother was "on the brink" of losing her child. Nonetheless, the Riverside Juvenile Court continued family maintenance services to the mother and terminated reunification services to the father. The case was transferred back to Orange County in January 2006.

In February 2006, SSA reviewed the status of the case. The mother "continues to have problems maintain[ing] stable employment and housing. She has moved multiple times without notifying her assigned social worker of her current whereabouts." Notwithstanding additional assistance from the Riverside County social worker, the mother had not participated in parenting, counseling, or substance abuse treatment. She has had at least two positive drug tests. "Case notes indicate that the child's mother had some criminal involvement during [late August and early September 2005]. She acknowledged stealing money from a towing company she was working [for] and had a court date for credit card fraud." Taylor, however, was doing well. "She reported that she likes living with her mother and she gets to see all her relatives."

In June 2006, the Orange County Juvenile Court conducted a six-month status review hearing. The social worker reported the mother had moved three times since January and had changed jobs at least once. She enrolled in the perinatal program in March 2006 and had completed the first out of four

phases, but she continued to be late for drug testing. Late tests are counted as positive tests. Taylor appeared to be well cared for and had perfect attendance at school. The court ordered six more months of family maintenance services.

The mother was terminated from her perinatal program "due to consistently being late for groups and for drug testing." She and Taylor moved in with the paternal grandparents. The father, who was out of custody, also lived there, in violation of the court order that he not be in unmonitored contact with Taylor. In November 2006, the mother moved to another apartment with Taylor; she also changed jobs again. In December 2006, SSA detained Taylor again after the social worker found a crack pipe in an ashtray in the mother's apartment. The juvenile court sustained a supplemental petition and placed Taylor back in the maternal grandparents' home. It denied further reunification services to the mother and set a permanent plan selection hearing. In January 2007, Taylor was moved to the paternal grandparents' home because the maternal grandmother became very ill and was told she did not have long to live.

SSA reported in June 2007 that the paternal grandfather had suffered a serious heart attack, leaving him with residual damage requiring therapy. The paternal grandparents could no longer care for Taylor and wanted her to return to the mother's care. The juvenile court ordered a 60-day trial release to the mother, which began in late June. This was initially successful, and the court continued the permanent plan selection hearing several times so the placement could be evaluated. But the mother was terminated again from her drug treatment program, continued to allow the father to have contact with Taylor, and lost her job and housing. The social worker removed Taylor from the mother and placed her back with the maternal grandparents, saying "It does not appear that the mother is ready for the child to remain in her care. She appears to need additional time to make her life ready for the child's inclusion and the undersigned is not convinced that the mother has acquired the skills to set appropriate boundaries with the child's father. There [is no] question that the mother and child have a strong bond and loving attachment."

The permanent plan selection hearing was held in October 2007. Pursuant to stipulation by all parties, the court found termination of parental rights would be detrimental to Taylor due to her beneficial relationship with the mother. The court ordered Taylor into long-term foster care with the "specific goal of placement with a relative . . . ." The maternal grandparents stated they were inappropriate for long-term care due to their age and medical conditions. Likewise, the paternal grandfather's health issues precluded the paternal grandparents from being a suitable placement. SSA was ordered to investigate Taylor's adult half sister, Dana C., who lived in Utah, as a placement.

In April 2008, SSA prepared a report for the six-month status review hearing. The social worker recommended that the court find Taylor's placement no longer appropriate and schedule another permanent plan selection hearing. Dana C. had declined placement and the maternal grandparents now wanted to adopt Taylor. The grandmother gave the social worker a document from her doctor stating her health was not a concern and she was capable of taking care of Taylor. Taylor was doing well in school and liked living with her grandparents. The grandparents named an aunt who lives in Texas as Taylor's conservator if something happened to them. "The aunt in Texas visits the child and the child reports she likes it when her aunt comes to visit and would not mind living with her aunt or her grandparents. The child reports she loves them all."

The mother had once again been terminated from her drug treatment program. She called Taylor only half of the time she was allowed. She attended "61% of her monitored visitations with the child of which she was late 81% of the time." She was significantly late, between 20 and 90 minutes. In December, the mother became angry and yelled at the social worker when reminded she could not see the child without a monitor. In January, the mother got into a physical altercation with the maternal grandfather, throwing a water bottle at him "hard enough for the bottle to reach the back patio sliding door" and screaming and yelling. In February, the social worker monitored a visit and had to admonish the mother when she talked about the domestic violence and infidelity of a person both she and Taylor knew.

At the review hearing, the mother objected to a new permanent plan selection hearing and asked for a hearing on whether a hearing should be held. As an offer of proof, the mother's counsel asked the court to take judicial notice of the SSA reports submitted at the last hearing. "And I would ask the court to take into consideration the fact that all parties stipulated that [the beneficial relationship exception] applied just six months ago. [¶] . . . [I]t appears to me the reason that the recommendation is changed is solely because the foster parents have agreed that they are now interested in adoption." The juvenile court denied the request for a hearing and set the permanent plan selection hearing for July 31, 2008.

## DISCUSSION

The mother contends the juvenile court abused its discretion by setting a permanent plan selection hearing when it previously found by clear and convincing evidence that the termination of parental rights would be detrimental to Taylor because the mother has "maintained regular visitation and

contact with the child and the child would benefit from continuing the relationship." (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i).)[1] The mother is wrong.

When a child is found to be not suitable for adoption because the beneficial relationship exception applies, "the court shall either order that the present caretakers or other appropriate persons shall become legal guardians of the child or order that the child remain in long-term foster care. Legal guardianship shall be considered before long-term foster care, if it is in the best interests of the child and if a suitable guardian can be found." (§ 366.26, subd. (c)(4)(A).) A child in long-term foster care shall have her status reviewed every six months. The review "may be conducted by the court or an appropriate local agency," but the court must conduct the review at least every 12 months. (§ 366.3, subd. (d).) At each review hearing, the court or the reviewing agency "shall inquire about the progress being made to provide a permanent home for the child, shall consider the safety of the child, and shall determine all of the following: [¶] (1) The continuing necessity for, and appropriateness of, the placement. . . ." (§ 366.3, subd. (e).) When the court conducts the review hearing, it "shall consider all permanency planning options for the child including whether the child should be returned to the home of the parent, placed for adoption, or appointed a legal guardian, or, if compelling reasons exist for finding that none of the foregoing options are in the best interest of the child, whether the child should be placed in another planned permanent living arrangement. *The court shall order that a hearing be held pursuant to Section 366.26, unless it determines by clear and convincing evidence that there is a compelling reason for determining that a hearing held pursuant to Section 366.26 is not in the best interest of the child because the child is being returned to the home of the parent, the child is not a proper subject for adoption, or no one is willing to accept legal guardianship.*" (§ 366.3, subd. (g), italics added.)

■ Thus, the statutory scheme provides that a child in long-term foster care shall not slip into oblivion; her status shall be reviewed every six months to make sure efforts are continuously being made to find her a more permanent placement. While the juvenile court is mandated to order a new permanent plan selection hearing every 12 months, unless such a hearing is not in the best interests of the child, it may order a new permanent plan selection hearing more frequently if circumstances have changed. (*San Diego County Dept. of Social Services v. Superior Court* (1996) 13 Cal.4th 882, 887–888 [55 Cal.Rptr.2d 396, 919 P.2d 1329]; see also Cal. Rules of Court, rule 5.740(b)(5).) The legislative preference is "for adoption over legal

---

[1] All statutory references are to the Welfare and Institutions Code.

guardianship over long-term foster care." (*San Diego County Dept. of Social Services v. Superior Court, supra*, 13 Cal.4th at p. 888.) When the court conducts the review hearing, it "proceeds under a presumption that long-term foster care is *inappropriate. It is obligated to act accordingly.*" (*Ibid.*, fn. omitted.) Therefore, when circumstances have changed, the court should hold a permanent plan selection hearing unless the mother proves there is a compelling reason not to do so.[2]

The mother acknowledges her burden to prove that a new permanent plan selection hearing would not be in Taylor's best interests. But she contends principles of due process afford her an absolute right to an evidentiary hearing to carry her burden. We disagree.

■ "Due process is a flexible concept which depends upon the circumstances and a balancing of various factors. [Citation.] The due process right to present evidence is limited to relevant evidence of significant probative value to the issue before the court. [Citations.] Even where cross-examination is involved, the trial court may properly request an offer of proof if an entire line of cross-examination appears to the court to be irrelevant to the issue before the court. [Citations.]" (*In re Jeanette V.* (1998) 68 Cal.App.4th 811, 817 [80 Cal.Rptr.2d 534].) ■ The juvenile court properly asked for an offer of proof, which was inadequate to compel a hearing. The mother merely claimed the court's finding six months previously that adoption would be detrimental to Taylor because of their beneficial relationship was sufficient to carry the burden. But dependency proceedings are dynamic, and the statutory scheme is designed to allow the juvenile court to assess and reassess the child as her circumstances change.

SSA pointed out several significant changes since the last hearing: The mother's contact with the child has lessened, and the grandparents were willing to fulfill the legislative goal of adoption. While the court may decide that adoption is not the best plan for Taylor after holding a new permanent plan selection hearing, it was certainly justified in taking another look.

Lastly, the mother cannot show prejudice from the juvenile court's decision to hold a new permanent plan selection hearing. The mother will have an opportunity to fully litigate the issues at that time.

---

[2] At oral argument, the mother urged this court to consider an unbriefed argument that the Legislature intended new permanent plan selection hearings for children in long-term foster care to be held no more frequently than every 12 months, based on section 366.3, subdivision (h). We decline to do so.

## DISPOSITION

The order setting a new permanent plan selection hearing was correct. Accordingly, we deny the petition for relief.

Aronson, J., and Fybel, J., concurred.

A petition for a rehearing was denied September 19, 2008.