Filed 10/29/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re A.B. et al., Persons Coming Under the Juvenile Court Law. | |
| MARIN COUNTY HEALTH AND HUMAN SERVICES,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>J.B.,<br><br>      Defendant and Appellant. | A140804, A141095<br><br>(Marin County<br>Super. Ct. No. JV25708A, JV25709A) |

Minors A.B. and Z.B. were removed from the home of their mother, J.B. (Mother), and placed in the homes of their respective biological fathers in early 2013 pursuant to Welfare and Institutions Code section 361.2.[1] After a contested disposition hearing, the dependency court upheld the removals, ordered the fathers to assume custody of the minors, declined Mother's request for reunification services, and ordered Marin County Health and Human Services (Department) to conduct home visits and report back within three months pursuant to section 361.2, subdivision (b)(2). We upheld these rulings in an earlier appeal. Mother now appeals from the dependency court's ensuing orders which again denied her reunification services, and terminated its jurisdiction as to A.B. She contends she had a due process right to a further evidentiary hearing on the home visit reports that could not be conditioned on the sufficiency of her offer of proof. We disagree, and affirm the findings and orders in issue.

---

[1] All further statutory references are to the Welfare and Institutions Code.

# I.  BACKGROUND[2]

## A.  *Predispositional Proceedings*

Minor A.B., born in September 2001, is the biological child of Mother and Julian L.  A.B. was diagnosed with autistic spectrum disorder at an early age.  A.B.'s half-sibling, Z.B., was born in October 2005.  Z.B.'s biological father is Gavin E.

### 1.  *Section 300 Petitions*

Just after midnight on December 31, 2012, San Anselmo police received a call that Z.B. had been observed running from his apartment toward a nearby park.  When officers found him he was crying and fearful of his mother.  When they brought Z.B home, officers saw a marijuana pipe, thousands of empty nitrous oxide containers all over the apartment, and very unclean and hazardous conditions, including rotting food in the sink, a toilet bowl full of feces, and prescription pain pills within reach of the minors.  A.B. was asleep upstairs.  Police arrested Mother for possible child endangerment, child abuse, and possession of illegal substances, and called the Department.  The boys were taken to an emergency foster home.

The Department filed section 300 petitions, alleging the boys were at substantial risk of harm due to Mother's inability to provide them with adequate care and supervision due to her "mental illness, developmental disability, or substance abuse."  Supporting facts were taken from the December 31 police report.  The Department recommended the boys be detained with their respective biological fathers, and Mother be given case plan services, including substance abuse treatment services, random drug testing, parenting education, and mental health counseling.  Both fathers requested custody of their sons.  The plan also included weekly supervised visitation for Mother with the minors.

On January 7, 2013, Mother submitted on detention.  The court found both fathers to have presumed father status, and made the recommended orders, including to provide both fathers with parenting education.

---

[2] Portions of this section are excerpted from our nonpublished opinion in an earlier, related proceeding.  (*In re A.B.* (May 19, 2014, A139346) (*A.B. I*).)

## 2. *Jurisdiction*

According to the jurisdiction report, there had been a total of 29 referrals regarding the family, dating back to 2005. Some were related to domestic disturbances between Gavin and Mother in 2005, and physical altercations between Gavin and his brother witnessed by Z.B. Others involved drug use and lack of supervision by Mother, and allegations by Mother of sexual abuse by Z.B.'s uncle during Z.B.'s visitation with Gavin (determined to be unfounded). In 2011, it was reported that Mother may have been under the influence of drugs or alcohol when she dropped Z.B. off for summer camp, that Z.B. stated Mother spanked him for no reason and would sleep and not supervise him or A.B., and that the minors did not get dinner or lunch at home sometimes. These reports were later determined to be unfounded or inconclusive. There were several reports of concerns about Mother's mental health and appearance of being overmedicated. Z.B.'s special needs school "had many concerns about this family." He had poor school attendance and many disciplinary actions, including suspension after he brought a lighter and some straw to school and said he knew how to burn the school down. He was suspended from school six times. A reporting party at the school believed Mother was abusing methamphetamines and/or prescription drugs, and was uncooperative with attempts to help her and Z.B. Mother ignored or rejected repeated attempts by the Department in 2012 to get her to agree to a voluntary case plan, and refused all forms of communication with the Department about services for the family.

Social worker Janelle Torres reported Mother told her she was attending a weekly support group and was participating in individual counseling. She had completed an outpatient substance abuse program three years earlier and attributed her current relapse to chronic pain arising after receiving a massage in 2010. Mother presented as disheveled and disorganized. Torres wrote that although Mother wanted to have her sons returned to her care and expressed willingness to participate in services, she tended to minimize the situations leading to the removal of her children, and blame others. Torres felt Mother would continue to endanger her children until she was willing to seriously address her chronic drug dependency and unstable mental health.

3

The court sustained an amended allegation that Mother put the boys at substantial risk of suffering serious physical harm or illness due to (1) her willful or negligent failure to supervise or protect the boys; and (2) inability to provide regular care for the boys due to mental illness, developmental disability, or substance abuse.

### 3. *Disposition Report*

A disposition report filed in March 2013 noted Mother had taken initiative in obtaining individual and group therapy, and a pain management course. Nonetheless, social worker Torres stated she was still deeply concerned about Mother due to her long struggle with a polysubstance dependency, and her recent relapse. Although Mother reported she had ceased to use inhalants as of early January 2013, she had made recent misrepresentations to that effect. Due to limitations in drug testing for nitrous oxide, the Department would have to rely on Mother's self-reports in order to protect the minors' safety and well-being in her care. The children stated Mother had instructed them not to divulge information about the family situation, and both children had complied. A.B.'s psychologist for the past year, Dr. Barbara Nova, also believed Mother had coached the children. The Department was "very concerned about [the minors] being safe in [Mother's] care and about being able to oversee [Mother's] ability to make appropriate and safe choices in the care of the children," and therefore could not recommend family reunification services for Mother.

Dr. Nova expressed concern about an "enmeshed" relationship between Mother and A.B, where Mother placed undue focus on A.B.'s body and hygiene. The relationship dynamics between A.B. and Mother tended to result in Z.B. being "pushed out," blamed for A.B.'s actions, and made to feel mistreated and resentful. The social worker wrote: "Dr. Nova stated that were [A.B.] to return to his mother's care she would be concerned about [A.B.] being neglected again [and] it was not clear that the children were always fed and getting their meals at appropriate times." Dr. Nova felt living with his father was having a positive effect on A.B., making him feel stronger and more empowered.

With respect to custody by their fathers, the social worker reported: "[I]t has been very positive for both [A.B.] and [Z.B.] that they are now safe, are able to continue being cared for within their family and that they seem happy with their fathers." She also reported visitation with Mother had generally gone well, the visits had been warm and positive, and Mother had acted appropriately for the most part. With regard to Z.B.'s father, Gavin, the social worker reported he "would like to participate in counseling to help him through the process of transitioning into being a full time father." Z.B.'s paternal grandmother said they "very much wanted to be more involved in [Z.B.'s] life." Although Z.B. said his father and uncle had sometimes fought, the Department learned Gavin completed an anger management course in 2006. In addition, about a year and a half had passed since Gavin and his brother had a physical fight. Based on Gavin's willingness to attend therapy and recent reports about Z.B.'s progress in school, the social worker concluded there were no concerns about the safety of Z.B. In a May 1, 2013 addendum to the disposition report the Department recommended termination of dependency jurisdiction as to Z.B.

With regard to A.B.'s father, Julian, the social worker wrote that he sought full custody of A.B. The social worker concluded Julian "can continue parenting [A.B.] safely and appropriately without the oversight of the Department and can ensure that [A.B.] maintains a relationship with his brother." The Department recommended dismissing the case as to A.B. with full physical custody of A.B. granted to Julian.

### 4. *Disposition Hearing*

The social worker testified the basis for the recommendations to remove the boys and not offer Mother services to reunify was concern the Department was unable to assure the children will be safe in Mother's care because (1) no tests can detect use of nitrous oxide; (2) Mother was not a reliable self-reporter; (3) A.B. indicated Mother has asked him to keep her use of nitrous oxide secret; and (4) in 2012, Mother "absconded" with the boys when she thought Child Protective Services (CPS) might remove them. The basis for the recommendation to give both fathers full custody and dismiss the dependencies was that the boys seemed to have positive relationships with their fathers

5

and seemed to be safe in their care. The social worker believed it was in the boys' best interests to continue to have contact with Mother through supervised visits.

On cross-examination, the social worker acknowledged there had never been any substantiated referrals that Mother physically abused either minor, and the amended petition contained no allegation that Mother had physically abused either child. The disposition report included opinions about Mother's mental health from A.B.'s individual therapist, who had done no therapy with Mother, or performed any mental health examination or evaluation of Mother. The social worker did not include information from Mother's therapist, Rose Rutman, in her disposition report because Rutman's observations of Mother did not agree with what she had observed. Rutman said Mother had been attending therapy consistently, and as of February 2013, was doing much better and making significant efforts to get her house cleaned up despite her physical impairments.

Mother asked the social worker on a number of occasions what case plan she had in mind for her, but the social worker never provided her with one. Mother was already working with a therapist and found a parenting class on her own. At some point the social worker told Mother a case plan for her would look like the services she was already receiving.

Mother testified about her medical diagnoses which caused pain and mobility issues, and required medications. After the incident causing court intervention, she signed up for a pain management class at Kaiser, and was told that she could start one shortly. She testified she was hopeful this would help her deal better with her pain. She had attended more than 25 Narcotics Anonymous meetings, which had also been very helpful. None of the things Mother had been doing had been the result of referrals or assistance from the Department. Through her own efforts she had also made many changes and improvements to her home. Mother believed the children could be safely returned to her custody at disposition with some supportive services in place.

Mother testified she got a domestic violence restraining order against Gavin in 2010, due to his verbal abuse. Mother had always tried to make it possible for Z.B. to

6

have a relationship with his father, but based on her conversations with Z.B., she was very concerned he would be at risk of harm in Gavin's custody.

Mother urged the court to provide for further supervision of the placement with the fathers and, at the same time, provide family reunification services to her.

### 5. *Dispositional Ruling and Appeal*

Over Mother's objection, the court ordered on June 3, 2013 that both fathers assume custody of their sons, subject to dependency court jurisdiction and requiring a home visit within three months, as set forth in section 361.2, subdivision (b)(2) (hereafter subdivision (b)(2)).[3] The court authorized Mother to have supervised visitation with the boys, but no family reunification services.

Mother filed a timely appeal. This court affirmed the dependency court's findings and orders in *A.B. I, supra,* A139346, filed on May 19, 2014. We found substantial

---

[3] Section 361.2 provides in relevant part: "(a) When a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child. [¶] (b) If the court places the child with that parent it may do any of the following: [¶] (1) Order that the parent become legal and physical custodian of the child. The court may also provide reasonable visitation by the noncustodial parent. The court shall then terminate its jurisdiction over the child. . . . [¶] (2) Order that the parent assume custody subject to the jurisdiction of the juvenile court and require that a home visit be conducted within three months. In determining whether to take the action described in this paragraph, the court shall consider any concerns that have been raised by the child's current caregiver regarding the parent. After the social worker conducts the home visit and files his or her report with the court, the court may then take the action described in paragraph (1), (3), or this paragraph. . . . [¶] (3) Order that the parent assume custody subject to the supervision of the juvenile court. In that case the court may order that reunification services be provided to the parent or guardian from whom the child is being removed, or the court may order that services be provided solely to the parent who is assuming physical custody in order to allow that parent to retain later custody without court supervision, or that services be provided to both parents, in which case the court shall determine, at review hearings held pursuant to Section 366, which parent, if either, shall have custody of the child."

7

evidence supported the removal order, and the court did not abuse its discretion by proceeding under subdivision (b)(2) instead of providing Mother with a case plan and family reunification services under section 361.2, subdivision (b)(3) (hereafter subdivision (b)(3)).

**B.** *September 9 Review Hearing and Interim Review Report*

The court scheduled a review hearing for September 9, 2013. The hearing was set to discuss the outcome of a mediation between the parties over visitation issues, and any other outstanding issues. In scheduling the hearing, the court stated it would consider extending the court's jurisdiction for an additional three months if the visitation issues were not resolved by the time of that hearing.

In its interim review report prepared for the September 9 hearing, the Department recommended the dependency petitions for both minors be dismissed and exit orders prepared by the parties' attorneys be adopted. The report stated in relevant part: "Both children seem to be doing well in their father's [*sic*] care. [A.B.] does not articulate having any worries in his father's home. He speaks positively about his experience there. [Julian L.] seems to be validating of his son and thoughtful about his parenting towards [A.B.] . . . [Z.B.] is having less behavioral outbursts, and seems to be managing his feelings better. [Z.B.] reports his father [is] using appropriate discipline and denies having concerns for his safety in his father's home. [¶] The Undersigned is, however, disappointed that the family has been unable to reach an agreement as to visitation. [Mother] seems to be capable of having positive interactions with her children when supervised . . . . She struggles with prompting the children . . . on directing their fathers as to how they should be parented. [Mother] also struggles being able to appropriately handle [Z.B.'s] difficult behaviors . . . . [and] seems to ascribe very negative traits to [Z.B.] . . . . [T]herapeutic visitation would be in the children's best interest . . . to help [Mother] better communicate with her children and better handle their behaviors and meet their needs. [¶] . . . The undersigned has made multiple visits to the home of [Julian L.] and [Gavin E.] and has determined that both children are safe and well cared for in their fathers' respective homes. . . . There are presently no concerns that would

8

warrant the Department's continued involvement in the lives of these families. It is the opinion of the Undersigned that in the best interest of the children, in order to retain the sense of normalcy and stability they so desperately need, that they remain in the physical care of their fathers and . . . have continued visitation with their mother."

With regard to Z.B., the report recounted one visit between Z.B. and Mother in which Z.B. became upset the visit was ending. He screamed out that he did not want to go back to Gavin's house, he wanted to go home. Mother asked him why, and he said, "Dad told CPS that they wouldn't argue but they do," and said he did not feel safe there. Z.B. later denied there was violence at Gavin's home and said he only "worried" it would happen. The Department investigated Z.B.'s allegations and determined they were unfounded.

The interim review report also addressed visitation issues. The social worker reported that supervised visitation between Mother and both boys had generally gone well although there were times when Mother needed to be reminded certain subjects were off limits such as discussing coparenting issues or matters concerning court strategy with the minors. The social worker expressed disappointment the family had been unable to reach an agreement as to visitation.

At the September 9 review hearing, the parties addressed the Department's recommendation for dismissal of the dependencies for both minors—which Mother opposed—as well as ongoing disputes over visitation schedules and supervision. The Department's counsel noted at the hearing that the court had decided three months earlier to keep the cases open in order to allow the parties to work out visitation issues amongst themselves before the cases were dismissed. The Department felt the boys were safe in their fathers' homes, nothing more could be done to help the families, the cases should be dismissed, and visitation issues should be resolved in the family court. Counsel for the fathers and the minors concurred the cases should be closed.

Mother disagreed with the Department's recommendations. She requested a hearing to present her side concerning allegations discussed in the Department's interim review report, as well as the Department's dismissal recommendations and outstanding

9

visitation issues. The court continued the then-existing orders and put the matter over to October 7, 2013, for a contested hearing on the Department's recommendations. The hearing date was ultimately continued to December 17, 2013. It appears from the record these continuances resulted primarily from further unsuccessful attempts by the parties to reach agreements concerning visitation.

## C. *Addendum Reports*

In November and December 2013, the Department prepared two short addendum reports to the interim review report. These were read and considered by the court in advance of the December 17 hearing. In the first addendum report, the social worker reported on two conversations she had with A.B's therapist on October 9, and 25, 2013, and on a meeting she had with A.B. on October 14, 2013. Dr. Nova told the social worker she was not in favor of Mother having unsupervised visits with A.B. but believed it was clinically important for A.B. to still have supervised visitation with his mother. Dr. Nova also opined that Mother having shared custody would not be in A.B.'s best interests, as he needs a home environment that is safe and where "he won't have to lie or learn to lie." Dr. Nova did not believe Mother could sustain progress in A.B.'s development as she treated A.B. in a child-like manner, encouraging his infantilizing and dependent behaviors. Dr. Nova agreed A.B. desperately wanted to please Mother and would have a hard time disclosing her substance abuse for fear of impacting their relationship.

A.B. told the social worker that he had had some nightmares about Mother, and was afraid she would "get sick and die." He said he enjoyed visits with her and "felt he needed" to go back to her, because he was afraid something bad would happen to her. A.B. said that, if he lived with Mother, he would cook her breakfast, give her foot massages, buy groceries, and meditate with her. He said if Mother began using nitrous oxide, he would call the police if she continued to use them after he asked her to stop. He affirmed Mother had asked him to keep her nitrous oxide use secret and he did not want to hurt her feelings or disappoint her by divulging this. He thought it was possible he

10

would feel the same way in the future and would not tell anyone if she was using nitrous oxide.

The first addendum report also recounted the social worker's conversations with Z.B.'s therapist and with Z.B. Z.B.'s therapist told the social worker it did not appear that Z.B. was being exposed to domestic violence, his behavior was improving, and he expressed being upset with Mother but also missing her. The therapist noted Z.B. "assumes some of the adult concerns in the home and becomes concerned when there is arguing in his home." Z.B. told the social worker he felt bad about disclosing what was going on in his home the night of his removal, and he did not like thinking about it.

Regarding Z.B., the social worker reported in the first addendum report that Dr. Nova, A.B.'s therapist, had expressed significant concerns about the relationship between Z.B. and Mother. Dr. Nova told the social worker she had observed "significant 'hostility' " and conflict between Mother and Z.B., and Mother had made several negative comments to her about Z.B. Z.B. had also called Mother names, made himself throw up in Dr. Nova's presence, and stolen toys from her office. Dr. Nova believed Z.B.'s behaviors were symptomatic of neglect and possible lack of nurturing in his early home environment. The social worker added that she worried the "unhealthy dynamics" between Z.B. and Mother would affect Z.B.'s ability to relate to others in healthy ways.

The second addendum report prepared in December 2013, recounted that on a visit with A.B. on November 27, 2013, Mother told A.B. that his therapist was a liar and could not be trusted—specifically referencing statements contained in the first addendum report—and told him not to divulge this conversation to his father or Dr. Nova. This conversation disturbed A.B. greatly, and he later divulged it unprompted to the social worker telling her that having to keep secrets made him feel bad and he worried about Mother having so many secrets. He expressed that no one other than Mother asked him to keep secrets. The social worker stated she was "deeply concerned" about Mother's visits with A.B. due to A.B.'s statements to her and due to her own and Dr. Nova's belief that, intentionally or not, Mother was continuing to interact with A.B. in ways that threatened his development into an independent adult.

11

**D. *Dismissal of A.B.'s Dependency Proceedings***

At the December 17th hearing, the Department withdrew its recommendation for the dismissal of Z.B.'s case and requested and obtained a continuance of the hearing in that matter based on new information discussed with the court off the record.

Regarding A.B., the Department took the position Mother was not entitled to a contested hearing on the issues before the court under subdivision (b)(2) since, among other reasons, Mother had already had a full contested hearing at the disposition stage on the same issues that were back before the court for review under the statute. The Department argued the court had contemplated back in June 2013, that it would dismiss the cases subject to the home visit reports, and specifically advised Mother in its June findings and orders that " 'Custody may be given to the parent with whom the child is currently placed and the jurisdiction of the Court dismissed' " at the next review hearing. According to the Department, the only issue left to be resolved at that time was the appropriate exit orders to make on visitation, which the court had hoped the parties could resolve among themselves before the case was dismissed. Counsel for Julian L. and A.B. concurred in the Department's position that Mother was not entitled to an evidentiary hearing. Mother's counsel disagreed, insisting Mother had a due process right to contest and dispute the information contained in the Department's interim review report and two addenda, including calling witnesses.

At the suggestion of A.B.'s counsel, the court requested an offer of proof from Mother's counsel concerning the new matters on which Mother intended to provide evidence. Counsel responded that Mother would dispute statements regarding events occurring during her visitation with A.B., as well as suggestions she was unable to meet A.B.'s needs and has him holding secrets for her, and made negative statements to him about his therapist. Mother also wished to dispute comments and diagnostic impressions Dr. Nova conveyed to the social worker about her and Z.B., who are not Dr. Nova's patients. Finally, Mother's counsel stated Mother would provide unspecified evidence and testimony "that there are concerns with regard to the current home situation [of both

12

minors]" and concerning "Mother's ability to be involved and support [A.B.] . . . who's autistic and has developmental needs . . . ."

The court found the offer of proof was directed at what it regarded as visitation issues, not placement issues, and ruled there was no need for further testimony regarding visitation issues. The court dismissed the dependency proceeding as to A.B., and continued the matter until December 23, 2013 to resolve details about the exit orders.

After hearing extensive argument on December 23, the court ordered Mother would have supervised visitation with A.B. two times per month for two hours at a time, on a schedule to be determined by Julian L. and Mother, with Julian L. to have sole legal and physical custody of A.B. subject to modification by agreement of A.B.'s parents. The court terminated its jurisdiction as to A.B. Mother timely appealed the court's orders (case No. A140804).

**E.** *Extension/Transfer of Z.B.'s Dependency Proceedings*

In an amended disposition report filed on January 8, 2014, the Department reported that Z.B.'s father (Gavin E.) and paternal uncle had a physical altercation in his presence in October or November 2013, which Z.B. disclosed to the social worker in December 2013. Gavin E. had a further angry outburst toward his mother the following day in which he kicked the car in which Z.B. and Z.B's grandmother were sitting. There had apparently been other incidents during the summer of 2013 in which Gavin had altercations with his parents and may have punched his mother. Z.B. also reported that Gavin had hit him on his bottom with a belt, but other family members denied any knowledge of Gavin using corporal punishment with Z.B. Gavin apologized for not having been forthcoming about the events due to fear of Z.B. being removed, and agreed family counseling was necessary to prevent further instances of domestic violence. The Department recommended against a change in placement for the time being, but proposed that family maintenance services be ordered for Gavin and Z.B. pursuant to subdivision (b)(3).

At hearings on January 6, and January 27, 2014, Mother objected to the Department's recommendation that only Gavin receive family maintenance services and

13

sought a contested hearing on that issue. Counsel for Gavin and Z.B. argued Mother's entitlement to services had already been litigated and could not be relitigated unless Mother filed a petition under section 388 showing changed circumstances. The Department proposed that Mother and Gavin could submit written statements on the issues, and the "contested hearing" could consist of the court considering those submissions along with the Department's reports before rendering its decision. Mother's counsel objected because this procedure would not allow Mother to cross-examine the social worker and present evidence from her own service providers. The court ruled that a full evidentiary hearing was not required. It requested that Mother prepare a witness statement outlining what she had done since the disposition hearing that would support her request for services under subdivision (b)(3).

Mother submitted a statement on February 5, 2014. She (1) discussed the efforts and progress she had made in addressing the issues that led to Z.B.'s removal; (2) responded to some of the allegations the Department had made concerning her parenting and relationship dynamics with Z.B.; and (3) made allegations concerning Gavin's mental health, drug use, and family conflicts. She stated: "I am requesting services under Sec. 361(b)(3). Providing me with services will benefit my children . . . and help ensure . . . [they] will not need to be placed in foster care, should they be removed from their respective father's care." Mother requested family therapy with Z.B. "so that I can continue to support my son and improve my relationship with him." She believed such family therapy "would be helpful for [Z.B.] as well so that he and I can communicate in a therapeutic setting, and he can feel safe to talk to me about things, with a professional there to help us." Father also submitted a short written statement.

In an addendum to the amended disposition report, filed on February 9, 2014, the Department recommended family maintenance services be provided for Z.B. and his

14

father pursuant to subdivision (b)(3), and recommended supportive services for Mother limited to visitation with Z.B. supervised by a therapist.[4]

Following brief statements by counsel at a hearing on February 10, 2014, the court denied reunification services to Mother, and authorized the Department to help arrange therapeutic visitation services for her. The court ordered family maintenance services for Gavin E., and transferred the matter to Stanislaus County where Z.B. and his father reside. Mother timely appealed (case No. A141095).

Mother's appeals raise substantially similar issues and were consolidated for disposition on the court's own motion.

## II. DISCUSSION

Mother contends she had a due process right to evidentiary hearings as to each minor under subdivision (b)(2) before the court could (1) deny her family reunification services under subdivision (b)(3); or (2) make exit orders under section 361.2, subdivision (b)(1) (hereafter subdivision (b)(1)). She maintains her right to an evidentiary hearing was absolute, and could not be conditioned on an offer of proof. Mother's due process contentions present an issue of law which we review de novo. (*In re J.F.* (2011) 196 Cal.App.4th 321, 329 (*J.F.*).) In case No. A140804 pertaining to A.B.'s case, Mother contends in the alternative that her offer of proof was sufficient to require an evidentiary hearing. We review the dependency court's decision in that regard for abuse of discretion. (*Ingrid E. v. Superior Court* (1999) 75 Cal.App.4th 751, 758–759.)

## A. *Due Process*

We start with the legislative history of subdivision (b)(2). Prior to the addition of this provision in 2005, when a child was removed from an offending parent and placed with a noncustodial parent under section 361.2, subdivision (a) the only options for the court were those now described in subdivisions (b)(1) and (b)(3)—making the

---

[4] This was not a change in the status quo. Mother was already being provided with therapeutic visitation services with Z.B.

15

noncustodial parent the legal and physical custodian of the child and terminating the juvenile court's jurisdiction, or maintaining jurisdiction and ordering reunification services to one or both parents, with permanent custody to be determined later. (Historical and Statutory Notes, 73A pt. 1 West's Ann. Welf. & Inst. Code (2008 ed.) foll. § 361.2, p. 33.)  The legislation adding current subdivision (b)(2) was named "Adam's Law" by the Legislature and the Governor's message in signing the law stated: " 'It is a travesty that a four-month-old baby lost his life at the hands of his abusive father.  This measure will give the courts additional tools to protect the safety of foster children placed with non-custodial parents.' "[5]  (Historical and Statutory Notes, 73A pt. 1 West's Ann. Welf. & Inst. Code, *supra*, foll. § 361.2, p. 36; Stats. 2005, ch. 632, § 1, p. 4825.)

In other words, the legislative intent of subdivision (b)(2) was simply to give the court and Department a further opportunity to confirm the minor's safety in the noncustodial parent's home before deciding whether to grant that parent legal and physical custody and dismiss the case, continue custody subject to court supervision, or remove the child from that parent's custody.  The presumption implicit in the statute is that if the Department identifies no issues of concern following the home visit, the noncustodial parent will obtain legal and physical custody and the case will be dismissed. The focus is on the noncustodial parent and the issue before the court is whether the minor is safe in that parent's home without further court supervision.  Subdivision (b)(2)

---

[5] A legislative committee analysis explained the purpose of the 2005 legislation as follows:  "According to the author, this bill is in response to an incident which occurred in Bakersfield in 2003 in which a four-month old boy was placed with his father, [a noncustodial parent] whose home had not been thoroughly evaluated for child safety and appropriateness.  Later, the child died as a result of physical abuse by his father.  This bill will increase scrutiny paid to biological parents who wish to take custody from foster parents by authorizing the court to require a home visit and emphasizing foster parents' opportunities to influence such placements."  (Assem. Com. on Appropriations, Analysis of Sen. Bill No. 726 (2005–2006 Reg. Sess.), as amended July 6, 2005, p. 1.)

is silent as to what role, if any, the previously custodial parent has at that stage of the proceedings.[6]

We note the court has complete discretion under subdivision (b)(2) over whether a home visit is even necessary in the first instance: "[N]othing in this paragraph shall be interpreted to imply that the court is required to take the action described in this paragraph as a prerequisite to the court taking the action described in either paragraph (1) or (3)." (§ 361.2, subd. (b)(2).) And, if the court does require a home visit, the statute does not expressly require *any* type of hearing following submission of a home visit report by the Department: "*After the social worker* conducts the home visit and *files his or her report* with the court, the *court may then* take the action described in paragraph (1), (3), or this paragraph." (*Ibid.*, italics added.) Since the dependency court has complete discretion whether to require a home visit before deciding to dismiss the case, it follows the court has equal discretion over whether to hold a hearing on the home visit report, and over the nature and parameters of any such hearing. If there is a hearing, its primary focus must be on the safety of the minor in the noncustodial parent's home. The parent from whose custody the minor has been removed would seldom have new evidence to offer on this subject that was not already considered at disposition a few months earlier.[7]

In this statutory context, we do not believe it offends due process to condition the right to a contested evidentiary hearing on an offer of proof of new evidence relevant to the child's safety in the noncustodial parent's home, or to other matters on which the

---

[6] The "current caregiver" referred to in subdivision (b)(2) is not the parent from whom the minor has been removed. Based on the provision's text and legislative history, the term refers to a foster parent or relative who has custody of the minor when placement with the noncustodial parent is being considered. The current caregiver's only role under subdivision (b)(2) is "[i]n determining whether to take the action described in this paragraph." As the last sentence of the subdivision makes clear, the "action described in this paragraph" means the action of requiring a home visit. Subdivision (b)(2) does not specify any role for the current caregiver once the court has decided to grant custody to the noncustodial parent subject to a home visit.

[7] We note the court can order a home visit to occur any time *within* three months.

court in its discretion wishes to hear further evidence. The latter might include exit orders if the court intends to dismiss the case, or the question of which parent or parents should receive reunification services *if* the court intends to continue supervision. We do not believe the statute or due process *compel* the court to hear evidence on any issue a party wishes to litigate or relitigate merely because the court has requested a home visit.

The record in this case shows the court ordered home visits hoping the additional time would allow the parties to work out visitation issues before the cases were dismissed. Reunification with Mother was no more than a remote possibility in the unlikely event the cases were not dismissed and legal custody could not be granted to one or both of the fathers even after the provision of further services. Forcing the court and the parties to relitigate the issue of services to the Mother absent a showing of new evidence or changed circumstances would have been unproductive for all of the concerned parties. We find nothing in the case law suggesting due process commands such a result.

It is well recognized that due process "is a flexible concept which depends upon the circumstances and a balancing of various factors." (*In re Jeanette V.* (1998) 68 Cal.App.4th 811, 817; see *Sheri T. v. Superior Court* (2008) 166 Cal.App.4th 334, 341.) Even where due process rights are triggered, it must always be determined "what process is due." (*In re Malinda S.* (1990) 51 Cal.3d 368, 383.) We look to "the private interest that will be affected by the agency's action, the risk of an erroneous deprivation of that interest, the interest in informing parents of the basis for and consequences of the action and in enabling them to present their side of the story, and the agency's interest in expeditious decisionmaking as affected by the burden caused by an additional procedural requirement." (*In re James Q.* (2000) 81 Cal.App.4th 255, 267 (*James Q.*).) Accordingly, our courts have recognized that "[d]ifferent levels of due process protection apply at different stages of dependency proceedings." (*In re Thomas R.* (2006) 145 Cal.App.4th 726, 733.)

In *James Q.*, cited by Mother, the Third District Court of Appeal held that a court may not deny a party the right to a contested review hearing based on an allegedly

inadequate offer of proof. (*James Q., supra,* 81 Cal.App.4th at p. 258.) The review hearing in issue in *James Q.* was a six-month review hearing pursuant to section 366.21, subdivision (e) to decide whether the appellant parent should receive an extended period of reunification services. (*James Q.*, at pp. 258–259.) In holding the parent's right to obtain a contested evidentiary hearing at that stage was absolute, the court emphasized the action taken at such a hearing could lead to a permanent severance of the parent-child relationship, and it was the agency's burden at that stage to prove the minor should not be returned to parental custody or services should be ended. (*Id.* at pp. 260–261.) Moreover, the statute itself expressly provided for a "hearing" to be held. (*James Q.*, at p. 261.) The court found review hearings during the reunification phase were also critical because they were the parent's "best opportunity . . . to make the strongest case possible" for returning the child to parental custody and the decisions made at them could not be relitigated at the termination hearing. (*Id.* at pp. 262–263.) *James Q.* specifically distinguished earlier cases holding that dependency courts may properly require an offer of proof before granting contested hearings in proceedings *following the expiration of the reunification period.*[8] (*James Q.*, at p. 267; see also *David B. v. Superior Court* (2006) 140 Cal.App.4th 772 [following *James Q.*, holding dependency court could not require father to tender offer of proof to obtain contested 18-month review hearing].)

In our view *James Q.* and the cases following it are distinguishable. First, Mother is not facing termination of her parental rights. The fundamental issue in proceedings under section 361.2 is which parent has the best potential to provide a safe and secure permanent home for the minor. (*In re Erika W.* (1994) 28 Cal.App.4th 470, 477 (*Erika W.*).) The statute "contemplates that reunification services will be offered only for

---

[8] *James Q.* distinguishes two Second Appellate District cases that arose in post-unification proceedings—*Maricela C. v. Superior Court* (1998) 66 Cal.App.4th 1138 and *In re Jeanette V.*, *supra*, 68 Cal.App.4th 811. In *In re Tamika T.* (2002) 97 Cal.App.4th 1114 (*Tamika T.*), another Second Appellate District panel specifically rejected *James Q.*, stating "due process does not require a court to hold a contested hearing if it is not convinced the parent will present relevant evidence on the issue he or she seeks to contest." (*Tamika T.*, at p. 1122.)

the purpose of facilitating permanent parental custody of the child by one or the other parent." (*Id.* at p. 476.) Unlike in *James Q.*, the denial of reunification services to Mother under section 361.2 is not a fateful step down the path toward terminating her parental rights. The parental interest at stake in a section 361.2 proceeding—which parent the minors will live with—is comparatively less consequential.

Second, a hearing following the three-month home visit under subdivision (b)(2) is not Mother's "best opportunity . . . to make the strongest case possible" for reunification services. Mother's best opportunity came at the three days of dispositional hearings held in May 2013, and the ensuing appeal to this court in *A.B. I, supra*, A139346. At the dispositional stage, Mother extensively cross-examined the social worker and other witnesses, as well as testifying herself and offering documentary and other evidence. The issue of whether Mother or the minors' fathers had the greater potential to provide the minors with a safe and secure home and which parent or parents should receive reunification services was front and center in that proceeding, and the dependency court's decision not to grant her services was the major subject raised in Mother's previous appeal. Conditioning Mother's right to a *further* evidentiary hearing on this issue on an offer of proof does not seem to present any issue of procedural fairness or risk of an erroneous decision comparable to those that troubled the court in *James Q.* Considering the litigation that has already occurred, and the interests at stake in addition to Mother's interest in recovering custody of the minors—the governmental interests in conserving judicial and agency resources, the fathers' interests in avoiding costly, duplicative litigation, and the minors' interests in stability and permanence—we do not think it offends due process for the court to determine in advance whether Mother proposes to offer new evidence pertinent to the matters left to be decided under section 361.2, or limits her as it did in Z.B.'s case to the submission of a written statement.

Mother also relies on cases concerning postpermanency review hearings under section 366.3.[9] (See, e.g., *In re Kelly D.* (2000) 82 Cal.App.4th 433, 437–440 (*Kelly D.*) [holding as a matter of statutory interpretation that father was entitled to notice of and a contested status review hearing on the agency's recommendation for a reduction of his visitation with the minors under § 366.3]; *J.F.*, *supra*, 196 Cal.App.4th at pp. 329–336 [holding on statutory and due process grounds that mother's right to a contested postpermanency review hearing on whether reunification was the best alternative option for child in long-term foster care could not be conditioned on an offer of proof].) As *J.F.* recognizes, the Courts of Appeal are divided on whether the right to a contested postpermanency review hearing may be conditioned on an offer of proof. (*Id.* at p. 327, citing *Maricela C. v. Superior Court*, *supra*, 66 Cal.App.4th 1138 and *M.T. v. Superior Court* (2009) 178 Cal.App.4th 1170, both holding offers of proof *can* be required under § 366.3.)

We need not pick sides in this conflict. *Kelly D.* and *J.F.* are distinguishable from our case. In both cases, the minors' permanent plans were long-term foster care. (*Kelly D., supra*, 82 Cal.App.4th at p. 435; *J.F., supra*, 196 Cal.App.4th at p. 328.) In both cases, the court recognized that long-term foster care "is not necessarily a stable placement." (*J.F.*, at p. 334; *Kelly D.*, at p. 438.) In both cases, the statute in issue expressly invites the parent to participate in the review process and seek to demonstrate if possible that additional efforts at reunification will promote the minor's best interests. (§ 366.3, subd. (f).) In these circumstances, a review hearing under section 366.3 bears many similarities to a review hearing during the reunification period in which, as

---

[9] In cases where the court has ordered a permanent plan of adoption or legal guardianship, section 366.3 requires status review hearings to take place every six months until the minor is adopted or a guardianship is established. (§ 366.3, subd. (a).) The statute expressly provides that unless parental rights have been terminated, the minor's parent or parents are entitled to notice of a right to participate in the hearings, and that the parents may try to prove that further efforts at reunification are the best alternative. (*Id.*, subd. (f).)

discussed *ante*, at least some appellate courts have held there is a due process right to a contested hearing. (See *Kelly D.*, at pp. 438–439; *J.F.*, at pp. 334–335.)

A review hearing held after a home visit report under subdivision (b)(2) presents a completely different situation. The minor is not in a temporary foster home, but living with a parent who has been found by the court to offer the best potential to provide a safe and secure permanent home for the minor. (*Erika W.*, *supra*, 28 Cal.App.4th at p. 477.) "[T]he focus of dependency proceedings 'is to reunify the child with a parent, when safe to do so for the child. [Citations.]' [Citation.] The goal of dependency proceedings—to reunify a child with at least one parent—has been met when, at disposition a child is placed with a . . . [non]custodial parent . . . ." (*In re Pedro Z.* (2010) 190 Cal.App.4th 12, 20, italics omitted.) Here, the issue of whether Mother should receive family reunification services had recently been litigated in a contested hearing, and neither the Department nor the minors' counsel had changed their views on that subject. As noted earlier, the statute is silent about whether the dependency court even needs to hold a review hearing before proceeding to order dismissal or supervision with services to only one parent, much less about the type of hearing the court must provide. The parent who has lost physical custody of the minor under section 361.2 is not left without recourse. If the dependency court decides to terminate its jurisdiction, the noncustodial parent's interests in custody and visitation can be heard in the family law court. If the court retains jurisdiction, any orders regarding custody, visitation, or services are subject to a petition under section 388 if the parent can demonstrate a change of circumstances. For all of these reasons, we find the reasoning of *Kelly D.*, *J.F.*, and similar cases does not extend to proceedings under subdivision (b)(2).

Finally, Mother cites *In re Michael W.* (1997) 54 Cal.App.4th 190 and *In re Roger S.* (1992) 4 Cal.App.4th 25, for the proposition that a parent who objects to the terms of exit orders made when a dependency case is dismissed under subdivision (b)(1) must be given an opportunity to put on evidence to show different orders should be made. These cases merely held the court has power to receive evidence relevant to appropriate exit orders on visitation when it terminates jurisdiction. (*In re Michael W.*, at pp. 194–

22

195, quoting and adopting the holding in *In re Roger S.*) They do not require the court as a matter of due process to hold an evidentiary hearing without regard to an offer of proof.

We therefore reject Mother's position that she had an absolute due process right to contested evidentiary hearings before the court could deny her family reunification services under subdivision (b)(3) in Z.B.'s case or dismiss the proceeding and make exit orders under subdivision (b)(1) in A.B.'s case. Since Mother makes no alternative argument in Z.B.'s case that the dependency court abused its discretion in finding her offer of proof insufficient to warrant an evidentiary hearing, we affirm the findings and orders in case No. A141095.

**B.** *Sufficiency of Offer of Proof in Case No. A140804*

Mother maintains that even if it was proper for the dependency court to condition an evidentiary hearing on an offer of proof in A.B.'s case, her offer of proof was sufficient to warrant a hearing.

As Mother points out, supervision of A.B. in his father's home had not been ordered or provided as of the post-home-visit hearing. The issue before the court was whether to dismiss A.B.'s case or to order supervision. And if supervision was ordered under subdivision (b)(3), there was the further issue of whether Mother would receive reunification services. According to Mother, because the dependency court had requested a home visit report under subdivision (b)(2) at disposition, its recent determinations on these issues no longer mattered and the court was bound to hear evidence on them again regardless of whether any of the evidence was "new." We do not agree.

As discussed earlier, the purpose of requesting a home visit is simply to provide an additional safeguard to verify the child's safety in the previously noncustodial parent's home. If the home visit report or other evidence brought to the attention of the court does not suggest issues requiring further supervision or calling into question whether that parent can provide a safe and secure permanent home for the child, the court has no reason to order supervision or consider reunification services for the other parent. The goal of the dependency proceedings—to reunify a child with at least one parent—has

23

been met. (*In re Pedro Z.*, *supra*, 190 Cal.App.4th at p. 20.) The mere selection of subdivision (b)(2) in lieu of subdivisions (b)(1) or (b)(3) at disposition does not, as Mother asserts, mandate repetitive proceedings over whether she should be receiving reunification services. That issue only arises if the child's safety and security in the noncustodial parent's home is placed in doubt. Mother's offer of proof failed to specify any evidence that would have cast doubt on the social worker's conclusion, based on multiple visits to Julian L.'s home, that A.B. was safe and well cared for there. As the dependency court observed, Mother's offer of proof was directed at visitation issues, not placement issues.

With respect to visitation and exit orders, the court heard extensive argument from Mother's counsel on December 17, and December 23, 2013 focused primarily on whether her visits should be supervised. She fails to persuade us the result would have been different had she been permitted to cross-examine the social worker or put on unspecified testimony she asserts would have contradicted statements about her interactions with A.B. in the interim review report and addenda before the court. An offer of proof "must be specific, setting forth the actual evidence to be produced, not merely the facts or issues to be addressed and argued." (*Tamika T.*, *supra*, 97 Cal.App.4th at p. 1124.) Moreover, given the extensive evidence in the record concerning Mother's problematic relationship with A.B., the sources of the negative information Mother disputed in the reports (A.B. and his therapist), and the adamant positions of minor's counsel and the Department on the issue, Mother fails to demonstrate an evidentiary hearing would have alleviated the court's concerns about unsupervised visitation.

## III.  DISPOSITION

We affirm the findings and orders in cases Nos. JV25708A and JV25709A.

_____
Margulies, J.

We concur:


_____
Humes, P.J.


_____
Banke, J.

25

Trial Court:   Marin County Superior Court

Trial Judge:   Hon. Faye D'Opal

Counsel:

Mary R. Williams, under appointment by the Court of Appeal, for Defendant and Appellant.

Steven M. Woodside, County Counsel and Brian C. Case, Deputy County Counsel for Plaintiff and Respondent.