Filed 5/1/26  In re T.H. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re T.H., a Person Coming Under the Juvenile Court Law. | |
| STANISLAUS COUNTY COMMUNITY SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MEGAN H.,<br><br>Defendant and Appellant. | F090170<br><br>(Super. Ct. No. JVDP-20-000007)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Annette Rees, Judge.

Richard L. Knight, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas Boze, County Counsel, and Michael Kalanta, Deputy County Counsel; Gordon-Creed, Kelley, Holl, & Sugerman, Jeremy Sugerman and Anne H. Nguyen, for Plaintiff and Respondent.

-ooOoo-

Megan H. (mother) appeals from the juvenile court's custody and visitation "exit order" granting sole physical and legal custody of her minor daughter, T.H., to T.H.'s father D.T. (father) following dismissal of dependency jurisdiction at a 12-month review hearing (Welf. & Inst.,[1] § 366.21, subd. (f)).  Mother contends (1) the visitation order requiring mother to bear the cost of professionally supervised visits or agree upon a third party supervisor with father constituted an unlawful delegation of judicial authority; (2) the denial of mother's request of joint legal custody was an abuse of discretion; and (3) the denial of mother's request for co-parent counseling was an abuse of discretion.

Finding no error, we affirm the juvenile court's findings and orders.

## FACTUAL AND PROCEDURAL SUMMARY

On March 28, 2024, the Stanislaus County Community Services Agency (agency) filed a juvenile dependency petition on behalf of then five-year-old T.H.  The petition alleged that T.H. came within the juvenile court's jurisdiction pursuant to section 300, subdivisions (a) (nonaccidental physical injury) and (b)(1) (failure to protect).

The petition arose from an incident where mother, with whom T.H. resided, hit T.H. causing a black eye and thereafter instructed T.H. to lie about it.  Mother minimized the incident, contending it was an accident and that she just " 'swatt[ed]' " at T.H.  The incident resulted in mother being arrested and charged with felony child abuse.

The petition listed numerous additional supporting facts, including that mother suffered from mental health issues, including post-traumatic stress disorder and anxiety, and substance abuse issues; had a significant child welfare history, including a previous dependency proceeding involving T.H. related to issues with domestic violence, substance abuse and mental health issues, during which mother was able to reunify with

---

[1]     All further undesignated statutory references are to the Welfare and Institutions Code.

2.

T.H; and had a criminal history, including infliction of corporal injury on a spouse or cohabitant, and was currently on parole.

The petition further alleged that father had not had contact with T.H. since she was about one year old. During T.H.'s previous dependency, father forewent reunification services and decided to continue not having contact with mother after she successfully reunified with T.H. He also admitted to past domestic violence issues and alcohol use.

T.H. was removed from mother's custody and placed with a relative.

The detention hearing was conducted on March 29, 2024, and the juvenile court ordered that T.H. remain detained. Father was declared the presumed father.

The agency's jurisdiction/disposition report indicated that both parents participated in voluntary services and visited with T.H. T.H. was doing well physically, developmentally, and educationally, but her teacher had noticed behavioral changes, and the agency made a referral for a behavioral health assessment.

The report included statements from the parents regarding the history of their relationship. Mother reported that she and father had been in a dating relationship and planned T.H.'s pregnancy. They got married in 2018, but he "disappeared" six months later, at which time she filed for divorce. Father reported he and mother divorced because mother was abusive and caused trouble for him and his family. As for father's contact with T.H., mother reported that father visited T.H. a couple of times when she was an infant but had not spoken to her for five years. Father explained that during T.H.'s first dependency case, his attorney advised him it would be in T.H.'s best interest if he waived reunification services because it was likely she would be adopted. He did not expect mother to reunify and did not want to continue bonding with T.H. if she was going to get adopted.

The agency further reported that the parents had a somewhat extensive domestic violence history and attached to its report several police reports documenting it. In June 2016, father witnessed mother having sexual intercourse with another man and chased the

man out of the house with a hunting knife. He thereafter got into a struggle over the knife with mother, during which she cut her hand. The incident resulted in father's conviction for felony assault with force likely to cause great bodily injury, for which he was granted probation. In 2018, there were several incidents of physical violence that resulted in police intervention with mother as the aggressor and father as the victim. Mother was arrested in conjunction with two of these incidents.

Mother was later convicted of felony corporal injury on a spouse or cohabitant and dissuading a witness in May 2020, arising from an incident where she assaulted, not father, but her then-current boyfriend. She was granted probation. The incident took place in T.H.'s presence and resulted in T.H.'s first dependency case.

The jurisdiction/disposition hearing in the present case was conducted on May 13, 2024. The juvenile court found the allegations in the petition true and that T.H. was described by section 300, subdivisions (a) and (b)(1). The court adjudged T.H. a dependent of the court, removed her from the parents' physical custody, and ordered the parents to participate in reunification services. The parents' case plans included co-parenting counseling, individual counseling, parenting classes and parent/child labs, and a substance abuse assessment.

Later in May 2024, a criminal protective order (CPO) was filed protecting T.H. from mother with no exceptions for court-ordered visitation, so visits with mother were suspended.

T.H. continued to do well and began mental health services. The parents engaged in their court-ordered case plans, and father began community visits with T.H. in July 2024. In September 2024, the CPO protecting T.H. from mother was modified to include an exception for court-ordered visitation, and visits with mother resumed. Mother pled guilty to felony child abuse in September 2024, with mandatory prison time being part of her plea agreement. In October 2024, the juvenile court granted the agency's section 388 petition for discretion to advance father to overnight visits leading to a trial visit.

The six-month review hearing was conducted on November 6, 2024. Minor's counsel indicated that T.H.'s overnight visits with father were going well, and T.H.'s stated interest at that time was to return to father. It was anticipated that a trial visit would begin soon. Minor's counsel also stated that after visits with mother, T.H. had started having behavioral challenges including defiance and outbursts. Counsel opined that it was likely due to a combination of anxiety separating from mother and mother telling T.H. "inappropriate things" at visits, such as mother having housing issues and being in a car accident. The court encouraged the parties to try to make sure that T.H. could engage with her mental health counseling following visits with mother and to submit a motion if monitored or therapeutic visits became necessary. The court ordered that reunification services continue and set a 12-month review hearing.

In December 2024, the juvenile court granted minor's counsel's unopposed request to suspend visitation pending mother's incarceration. Mother thought her sentencing would take place in December, and she therefore had informed T.H. she would not see her for a while, and they said their goodbyes. T.H. initially reported being happy about no longer visiting mother but when she got home, she "tore apart her bedroom while throwing her things and screaming." Mother's sentencing hearing was continued to January 2025, and minor's counsel represented that it would be detrimental for T.H. to continue visiting with mother for an additional three weeks and have to say goodbye again.

The agency's 12-month status review report dated April 18, 2025, recommended the juvenile court order T.H. be returned to father, grant father sole legal and physical custody, and dismiss dependency. The report indicated that T.H. had been on a trial visit with father since December 20, 2024. The visit had been going well, and no concerns had been noted. Father had secured stable housing and had been able to provide for himself and T.H. during the trial visit. The report indicated that mother was incarcerated in prison with a parole eligibility date of June 2026. The CPO was reissued as an order

5.

upon mother's conviction, with an exception for court-ordered visitation and an expiration date of January 10, 2029.

Over the reporting period, both parents had continued to engage in their case plans. Prior to mother's incarceration, she had completed a mental health assessment and had began medication management and individual therapy. She had completed parenting education and parent/child labs. Father had completed parent education and parent/child labs and participated in individual therapy. The parents had not begun co-parenting counseling; in November 2024, father's clinician advised the agency, "after speaking with [father] and my supervisor, [father] is not ready to begin co parenting [*sic*] classes and my clinical recommendation aligns with [father] as of right now I would not recommend beginning co parenting [*sic*] classes." Mother was thereafter incarcerated, and the counseling never commenced. Mother visited with T.H. somewhat irregularly prior to being incarcerated. After being incarcerated, she had a telephone call with T.H., wrote letters to T.H. through the agency, and the agency provided photographs of T.H. to mother on a monthly basis.

In a letter father wrote to express his thoughts on the case, he stated that having T.H. in his custody had been the happiest time of his life. T.H. had voluntarily shared with him that mother often used to hit her in the mouth, and when T.H. made a mistake, she was afraid mother would hit her. Father felt T.H. had made "huge strides" and noted that since T.H. had been living with him and had limited contact with mother, T.H. "no longer lives in fear." Father encouraged T.H. to express her feelings and tried to make his expectations clear to her. He noted T.H. no longer had " 'melt downs.' " According to father, T.H. was doing very well, was enjoying school, and had learned how to be "more self-sufficient, how to deal with emotions, and has become a very happy, respectful child."

Father went on to express that he was requesting the juvenile court "to strongly consider not allowing any custody to [mother]." He felt mother had "evil" intentions and

that while he felt it was not relevant to the case, mother had "caused great bodily, mental, and emotional harm" to him, causing him to have nightmares and fear for his well-being. He felt mother's behavior had escalated over the years, and it would "be detrimental to [T.H.]'s well-being for her to be in [mother]'s care even for a moment." Father went on to say he did not feel "that any type of visitation, not even a letter is good for [T.H.]." He felt any contact would "allow [mother] to attempt to manipulate and guilt [T.H.] which [mother] has already been observed doing during this case." Finally, he asserted that when T.H. is older and able to further understand the case and the surrounding circumstances, she can decide if she wants to have any contact with mother.

The hearing was thereafter set for contest on the issue of mother's visitation. At the time the contested hearing was set, minor's counsel informed the juvenile court that T.H. and mother were both writing letters to one another that the other was not receiving. The court informed the parties that written communications should go to the social worker and be forwarded both ways if appropriate. Father told the court he was not aware of any letters T.H. had written but that he would ask her about it.

The contested 12-month review hearing was conducted on June 17, 2025. The juvenile court admitted the status review report into evidence and allowed mother to make a statement as to her substantive requests and the rationale behind them.

Mother explained she had raised T.H. on her own for the first six years of her life. She would have appreciated help, and if father had tried to have a relationship with T.H., she would have supported and encouraged it. She felt father's letter, however, demonstrated "his promise to alienate [T.H.]'s affections by denying her my phone calls and … letters to her." Mother stated she was requesting co-parenting counseling based on these statements. She further represented that she was on track to be released in four to eight weeks on an ankle monitor and that if granted "50 percent custody," she would be able to secure housing for T.H. and herself. She planned on finishing her bachelor's degree in psychology and sociology in less than one year. She planned to receive

financial aid and disability social security and would be able to provide for T.H. "physically and financially." She further stated she had been approved for early release because she had been "properly rehabilitated due to the extent of [her] self-work." She asserted she had completed a 52-week domestic violence class, anger management, addiction counseling, positive parenting, and parenting from prison.

The juvenile court thanked mother for her statement and commended her for her positive efforts. The court added that it construed statements in father's letter "to be expressing [his] care and [his] concern and [his] best efforts to protect [T.H.], and I take it in that vein." The court went on to hear argument from counsel.

County counsel noted that early release was not mother's "present circumstances." He further pointed out that based on the last indication from father's mental health clinician, "coparenting classes are basically contraindicated" based on the clinician's opinion that father was not ready for them.

Minor's counsel indicated that she met with T.H. recently. T.H. was doing very well with father, and father had proven he is an appropriate parent by completing his case plan and providing a safe home to T.H. Counsel noted T.H.'s stated interest was to return to mother but counsel "cannot support her stated interest due to [mother]'s incarceration and the CPO" and asserted that it was in T.H.'s best interest "to return to [father]'s custody with dependency being dismissed." Counsel further indicated that because T.H. missed mother and having no contact with her would not be in T.H.'s best interest, counsel was in favor of supervised Zoom visits or telephone calls while mother is in custody and supervised in-person visits upon her release. Counsel noted that if the parents cannot locate a supervisor to supervise the Zoom visits, they "must decide on a third party that they deem appropriate because the lack of a supervisor should not result in [T.H.] not getting to see [mother]."

Mother's attorney requested that the juvenile court "consider extending the dependency for a few more months," as well as order joint legal custody, or in the

alternative, joint legal custody with father being the primary decision maker; co-parenting counseling; and weekly visitation with unsupervised contact upon mother's release.

Father's attorney requested that the CPO exception for court-ordered visitation be terminated, "allow[ing] the full CPO to take effect." In the alternative, father's attorney proposed visitation with mother to consist of one two-hour Zoom visit per month for the remainder of mother's incarceration and, upon mother's release, one four-hour visit per month. Father's counsel requested visits be supervised professionally, with mother to bear the cost, or by a third party agreed upon by both parents and that mother be allowed two written communications per month.

In ruling, the juvenile court noted it had considered the report, mother's statement, and the arguments and comments by counsel. The court declined to alter the CPO or delete the carve-out exception in order to protect T.H.'s physical and emotional health. The court also declined to grant any further services for mother in the interest of stability and permanence for T.H. Rather, the court stated it would be returning T.H. to father's custody and dismissing dependency with custody orders, finding the circumstances that existed that caused T.H.'s removal would not exist nor reoccur if it were to do so.

The juvenile court further stated it agreed with father's attorney's visitation proposal. The court denied mother's request for co-parent counseling, stating, "That is not to say I don't think it is a very good idea, and at some point in the future, that may very well serve [T.H.] well. Forcing it to happen now does not make good sense for [T.H.] or certainly … father, if … he is not ready to participate in that regard, and I understand his position in that regard, then I am not going to make that order. However, I will certainly agree that it is in the child's best interest to have two parents involved at some level in her life, and hopefully as she feels safe and comfortable to do so, that will continue to develop."

The juvenile court found that return of T.H. to father's custody would not create a substantial risk of detriment but that return to mother would. The court ordered that T.H.

9.

would remain in the custody of father, with father having sole legal and physical custody. In accordance with father's attorney's visitation proposal, the court ordered mother to have a minimum of one Zoom visit per month for up to two hours while she was incarcerated and upon her release a minimum of one visit per month for up to four hours. The visits were to be supervised by a professional supervisor or an agreed upon third party. Mother was to bear any cost for a supervisor. Mother could also have two other communications with T.H., such as letter or telephone. The court noted that if "problems [with custody and visitation orders] arise within a year, then that should come back to this Court to reopen the dependency and examine. If it is after a year, then it will likely go before a family law judge … to decide if there should be any modification of custody and visitation." With these findings and orders, the court dismissed dependency.

## DISCUSSION

### I. Denial of Mother's Requests for Joint Legal Custody and Co-parent Counseling

#### A. *General Legal Principles and Standard of Review*

If the juvenile court terminates its jurisdiction over a dependent child, it may issue orders determining the custody of, or visitation with, the child. (§ 362.4, subd. (a).) Such orders "shall continue until modified or terminated by a subsequent order of the superior court." (§ 362.4. subd. (b).)

In making an order under section 362.4, subdivision (a) or "exit order," the juvenile court's primary consideration is the best interests of the child. (*In re J.M.* (2023) 89 Cal.App.5th 95, 112 (*J.M.*).) In determining what is in the child's best interests, the court must consider the totality of the circumstances. (*In re Chantal S.* (1996) 13 Cal.4th 196, 201.) The best interests of the child standard " 'is an elusive guideline that belies rigid definition. Its purpose is to maximize a child's opportunity to develop into a stable, well-adjusted adult.' " (*In re Ethan N.* (2004) 122 Cal.App.4th 55, 66.) "In any custody

determination, a primary consideration in determining the child's best interests is the goal of assuring stability and continuity." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)

The juvenile court has "broad discretion" to make exit orders. (*In re Nicholas H.* (2003) 112 Cal.App.4th 251, 265, fn. 4.) We review the court's order for abuse of discretion and "may not disturb the order unless the court ' " 'exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300.) We look at whether, in light of the record, the court's ruling falls within the permissible range of options set by the legal criteria. (*Pack v. Kings County Human Services Agency* (2001) 89 Cal.App.4th 821, 838.)

### B. Granting Sole Legal Custody to Father Was Not an Abuse of Discretion

Mother contends the juvenile court abused its discretion by denying her request for joint legal custody of T.H. In support, she cites a parent's general constitutional rights to the care, custody, and management of their children. She further asserts, citing *J.M.*, *supra*, 89 Cal.App.5th 95, that the juvenile court's "conclusion that 'terminating jurisdiction was appropriate because the dangerous conditions justifying assumption of jurisdiction under section 300 no longer existed," necessarily included a finding that mother's "ability to parent [T.H.] should have been completely restored to her." Mother's position is not well taken; it appears to be based on a misunderstanding of the applicable legal authority and the facts and circumstances of the present case.

If we understand mother's claim, following her reasoning to its logical end, (1) a juvenile court that finds dismissal of dependency jurisdiction is proper could never order anything other than joint legal and physical custody, and (2) dependency jurisdiction could never be terminated unless both parents pose no risk. This is contrary to dependency jurisprudence. (See *In re Destiny D.* (2017) 15 Cal.App.5th 197, 208 [stating that exit orders limiting an offending parent's contact with a child can lead to termination

11.

of jurisdiction "[i]f no substantial risk of harm exists once those restrictions are in place"].) Mother's claim is also directly belied by the main case she relies on – *J.M.*

*J.M.* is not apposite nor helpful to mother. In *J.M.*, following a section 364 hearing, the parents were granted joint legal custody, and the mother was granted sole physical custody by the court's exit order. (*J.M.. supra*, 89 Cal.App.5th at p. 109–110.) The father appealed, arguing in part that the court was required to make a finding of detriment pursuant to section 361[2] as to him in granting the mother sole physical custody. (*J.M.* at p. 112.) The appellate court rejected this argument, holding that the juvenile court was only required to assess the best interests of the children when making its custodial exit orders. (*Ibid*.) In this context, the appellate court explained the juvenile court was *not* required to make findings under section 361, noting in part, as quoted by mother in the present case, that:

> "once the court found that terminating jurisdiction was appropriate because the dangerous conditions justifying assumption of jurisdiction under section 300 no longer existed, the court could not also find under section 361 that there was substantial danger to a child justifying removal from a custodial parent." (*J.M.*, *supra*, 89 Cal.App.5th at p. 114.)

Mother relies on this quote to suggest that when a juvenile court finds that dismissing jurisdiction is appropriate, it has no basis on which to limit a parent's custody. Mother has misread this quote and taken it out of context. *J.M.* does *not* stand for such a proposition. Rather, it holds that in making custody exit orders, a juvenile court may limit physical custody of a parent without making a detriment finding, when that order is in the child's best interest, which we note is arguably a more permissible standard. *J.M.* illustrates this, as the appellate court there ultimately concluded that the juvenile court

---

[2] Section 361, subdivision (c)(1) provides that a child must not be removed from a parent's physical custody unless the court finds, as relevant here, "[t]here is or would be substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home."

12.

had not abused its discretion by concluding that awarding sole physical custody to the mother was in the children's best interests, noting that disposition was supported by evidence on the record, despite the fact that no detriment finding was made. (*J.M.*, *supra*, 89 Cal.App.5th at p. 115.)

Further, unlike in *J.M.*, the juvenile court here *did* make a finding that return to mother's custody would create "a substantial risk of detriment to the safety, protection, or physical or emotional well-being" of T.H. pursuant to section 366.21, subdivision (f)(1).[3] This finding is not acknowledged nor challenged by mother on appeal.[4] Having found that return to mother, but not father, would pose such a risk, the reason the juvenile court determined further court supervision was unnecessary was, as it pointed out in its ruling, because T.H. was *returned to father*, with appropriate restrictions on mother's contact with T.H. That is, contrary to mother's assertions, nothing in the court's findings support

---

[3]    The juvenile court in *J.M.* was in a different procedural stance, as it dealt with orders made at a section 364 hearing rather than a section 366.21, subdivision (f) hearing.

Courts conduct section 364 hearings when a child is under the juvenile court's supervision pursuant to section 300, but is not removed from the physical custody of the parents. As such, at a section 364 hearing, the primary focus is whether "the conditions still exist which would justify initial assumption of jurisdiction under Section 300, or that those conditions are likely to exist if supervision is withdrawn." (§ 364, subd. (c).)

Conversely, at a section 366.21, subdivision (f) hearing, which is conducted after a child has been removed from the physical custody of their parents, the court, before determining whether dependency should be dismissed, must determine whether "return of the child to the physical custody of their parent … would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (f)(1).)

[4]    Mother suggests that the juvenile court could not place T.H. in mother's physical custody only because she was incarcerated at the time of the hearing. This assertion overlooks that the court made the detriment finding she does not challenge, that incarceration cannot be the sole factor on which a court bases a detriment finding (see *In re Noe F.* (2013) 213 Cal.App.4th 358, 369), and the other factors the court may have considered in making its detriment findings, including, as we discuss in the body of the opinion that mother's incarceration resulted from an act of physical violence perpetrated on T.H.

mother's suggestion that the court somehow found mother posed no risk to T.H. so that her "ability to parent [T.H.] should have been completely restored to her" by virtue of termination of dependency jurisdiction.

Moreover, contrary to mother's assertions, her constitutional rights to the care of her child did not entitle her to joint legal custody upon termination of dependency jurisdiction. Because juvenile dependency proceedings arise when children are subject to or at risk of abuse or neglect, custody orders are not made "until the child has been declared a dependent of the court and in many cases, such as this one, the child has been removed from the parents upon clear and convincing evidence of danger. The issue of the parents' ability to protect and care for the child is the central issue[, and the] presumption of parental fitness that underlies custody law in the family court just does not apply to dependency cases." (*In re Jennifer R.* (1993) 14 Cal.App.4th 704, 712; accord *In re Chantal S.*, *supra*, 13 Cal.4th at p. 206.) "Rather the juvenile court, which has been intimately involved in the protection of the child, is best situated to make custody determinations based on the best interests of the child without any preferences or presumptions." (*In re Jennifer R.*, at p. 712.)

Here, the juvenile court reasonably concluded granting sole legal custody to father was in T.H.'s best interests. T.H. was removed from mother's custody due to an incident of physical abuse that resulted in a criminal conviction and a prison sentence. As such, at the outset of the dependency case, mother had shown she was incapable or unwilling to provide the most basic protection of T.H.'s physical and emotional safety. At the time the exit order was made, mother was still serving her sentence. The juvenile court found her progress in her case plan had been "limited" due to her incarceration. By virtue of the stage mother was in in her criminal case, which resulted from the harm she perpetrated on T.H., the court was reasonable in concluding she had not had time to prove herself capable of making decisions for the good of T.H.'s well-being.

14.

Further, as mother points out in her briefing, the parents had a troubled history. The record shows that placing the requirement on father to communicate with mother could potentially cause him considerable distress. He had a domestic violence relationship with mother, including multiple documented instances where he was the victim of mother's physical assaults. He informed the court these experiences caused him to suffer from nightmares and fear, and in his opinion, mother's intentions were "evil," and any contact with mother posed a risk to T.H. His mental health clinician stated that he was not ready to participate in co-parenting counseling with mother. Thus, it was reasonable to conclude that the parents' fraught relationship could hinder their ability to make the best decisions for the care and custody of T.H. and/or that any stress placed on father to make joint decisions for T.H. could negatively affect his ability to provide her with a healthy happy home.

For the foregoing reasons, we conclude the juvenile court was reasonable and within its discretion in finding that granting father sole legal custody of T.H. was appropriate and in T.H.'s best interests; we therefore find no error.

### C  Denying Mother's Request for Co-parent Counseling Was Not an Abuse of Discretion

Mother also contends the juvenile court abused its discretion by denying mother's request for co-parenting counseling. She argues that because father indicated he did not feel contact with mother was in T.H.'s best interests, and because T.H. expressed a desire to have contact with mother, the parents "needed to have co-parent counseling." She further states there was "no way that [T.H.] would not benefit from" the parents participating in co-parenting counseling. We disagree.

Here, the juvenile court acknowledged that co-parenting counseling could have some benefit for T.H. in the future, but at that time, it was not an appropriate order. The court's decision was supported by father's counselor's statements that father was not ready for co-parenting counseling with mother. We reject mother's suggestion that the

15.

court was compelled to order co-parenting counseling, as it could only benefit T.H. The court could have reasonably concluded that ordering counseling that was not recommended by father's mental health services provider could have a negative effect on father and consequently a negative effect on his ability to care for and parent T.H. to the best of his ability.

We conclude the juvenile court was reasonable in determining it was not the right time for co-parenting counseling and declining to order it was not an abuse of discretion.

## II. Visitation Order

### A. The Visitation Order Did Not Constitute an Unlawful Delegation of Judicial Authority or an Abuse of Discretion

Mother contends the juvenile court's visitation order requiring mother to pay for a professional supervisor or agree with father on a third party supervisor constituted an unlawful delegation of judicial authority and violated the separation of powers doctrine. She contends the visitation order improperly gave father discretion to determine whether visitation would occur because he could disagree with mother on every third party she suggested , in effect requiring her to utilize a professional supervisor, which she cannot afford. We disagree with mother that the court's order unlawfully delegated the issue of whether visitation would occur or that it otherwise was an abuse of discretion.

The juvenile court may not delegate the "power to determine the right and extent of visitation by a noncustodial parent in a dependency case," and this rule "applies to exit orders issued when dependency jurisdiction is terminated." (*In re T.H.* (2010) 190 Cal.App.4th 1119, 1122–1123 (*T.H.*).) However, "[a] visitation order may delegate to a third party the responsibility for managing the details of visits, including their time, place and manner." (*Id*.at p. 1123.) "Only when a visitation order delegates … the absolute discretion to determine whether any visitation occurs does the order violate the statutory scheme and separation of powers doctrine." (*In re Moriah T.* (1994) 23 Cal.App.4th 1367, 1374.)

16.

Mother primarily relies on *T.H.*, *supra*, 190 Cal.App.4th 1119 to support her argument. *T.H.* is inapposite. In *T.H.*, the appellate court found an order that "supervised visitation would occur, but only upon the 'agreement of the parties' " improperly delegated the issue of visitation to the custodial parent. (*Id*. at p. 1123.) The appellate court reasoned that pursuant to that order, the custodial parent "could conceivably agree to only one visit a year or less without violating the letter of the court's order." (*Ibid*.)

Here, there is nothing in the language of the juvenile court's visitation order to support a claim that father could determine whether visits take place at all. To the contrary, the plain language of the order indicates that mother is entitled to a minimum of one visit per month for two hours while she remains incarcerated, and a minimum of one visit per month for four hours upon her release. The order did not make such visitation contingent on approval by father, even if the parents could not reach an agreement on a third party supervisor. In such an instance, mother could assure her minimum visitation by arranging for a professional supervisor.

Mother asserts for the first time on appeal her inability to pay for a professional supervisor. She asserts that she "can't afford to pay for a professional supervisor since she is in prison – so she won't be able to have virtual visits with her daughter while she is in prison." She goes on to say, "When she is released, she will have a difficult time getting hired as a person with a felony conviction, which will further hinder her ability to have visits." Mother concludes, assuming the parents could not agree upon a third party supervisor, she "will therefore not ever be able to visit with [T.H.] while she is incarcerated or after she is released."

Despite mother's assertions, there was no evidence before the juvenile court that mother could not pay for a professional supervisor. She did not object to the portion of the order requiring her to pay for a professional supervisor or assert she could not pay. She provided no evidence regarding the cost of a professional supervisor or that any sliding scale or low-income pricing was unavailable to her. To the contrary, mother

17.

testified at the 12-month review hearing that she was fully capable of financially providing for T.H. if she were to be granted partial physical custody. She stated she was planning on finishing her degree, obtaining financial aid, and collecting disability payments. Prior to her incarceration, she was gainfully employed, despite having a prior felony on her record. There is simply no evidence on the record that mother could not afford a professional supervisor. We therefore cannot say the court's order was in effect delegating to father the authority to determine whether visitation would take place or was unreasonable.

We note that Division Eight of the Second District recently found merit in a similar argument to mother's in *In re Reyna R.* (2026) 118 Cal.App.5th 486, 492. There, the appellate court found the juvenile court abused its discretion by ordering that visits between the child and the father be supervised by a professional monitor paid for by the father without determining whether the father had the ability to pay or considering reasonable alternatives like an unpaid monitor agreed upon by the child welfare agency and/or the mother. (*Id*. at pp. 493–494.) The court reversed the visitation order and remanded for a hearing on the father's ability to pay or reasonable alternatives to a paid professional monitor. (*Id*. at pp. 494–495.)

*Reyna R.* is distinguishable from the present case and highlights some of the weaknesses in mother's argument. Central to the *Reyna R.* court's analysis was that the father in that case made a timely objection to the visitation order, asserting he could not pay for a professional monitor. (*Reyna R.*, *supra*, 118 Cal.App. 5th at p. 494.) Here, as we have stated, mother made no such objection. Further, the court in the present case provided what the *Reyna* court deemed a "reasonable alternative" namely an unpaid supervisor agreed on by the parents. (See *ibid*.)

18.

**B.  Mother's Attorney's Post-judgment Declaration Will Not be Considered Pursuant to Code of Civil Procedure Section 909**

Attached to mother's reply brief is a declaration by her appellate counsel, indicating that since the exit orders were issued, father has not answered or returned mothers calls to attempt to schedule visitation, and mother has not had a single virtual visit or communication with T.H.  Mother offers this as evidence that father is unwilling to arrange visitation with mother to dispute the agency's assertions that mother's claims regarding father's ability to thwart visitation were "speculative."

Mother requests we consider the declaration pursuant to Code of Civil Procedure section 909, which allows a reviewing court, for the purpose of making factual determinations contrary to or in addition to those made by the trial court or for any other purpose in the interest of justice to "take additional evidence of or concerning facts occurring at any time prior to the decision of the appeal."  The agency objects to our consideration of post-judgment hearsay.

We will not consider the declaration.  Authority to make findings of fact under Code of Civil Procedure section 909 should be "exercised sparingly," and "[a]bsent exceptional circumstances, no such findings should be made."  (*In re Zeth S.* (2003) 31 Cal.4th 396, 405.)  "[A]n appellate court should not consider postjudgment evidence going to the merits of an appeal and introduced for the purposes of attacking the trial court's judgment."  (*In re Josiah Z.* (2005) 36 Cal.4th 664, 676.)

We conclude the declaration mother has attached to her reply brief is not appropriate for our review.  Mother has not asserted any exceptional circumstances to justify our consideration of this postjudgment evidence, especially as it is being offered to support a reversal.  Further, the content of the declaration does not appear relevant to the issue before us.  In our view, asserting that father is not communicating with mother bears more on whether he is complying with the visitation order, not the propriety of the order itself.

19.

### C. Conclusion

For the foregoing reasons, we find no error with regard to the juvenile court's visitation order. If mother is unable to pay the cost for a professional supervisor or father is refusing to comply with the visitation order, mother's remedy is to raise the issue with the superior court. (See, e.g., *In re A.B.* (2014) 230 Cal.App.4th 1420, 1439 ["If the dependency court decides to terminate its jurisdiction, the noncustodial parent's interests in custody and visitation can be heard in the family law court"].)

## **DISPOSITION**

The juvenile court's findings and orders are affirmed.


DESANTOS, J.

WE CONCUR:


HILL, P. J.


MEEHAN, J.